ALGONAC MANUFACTURING COMPA-
NY (a Close Michigan Corporation) and
John A. Maxwell, President and Sole
Stockholder of Algonac Manufacturing
Co., and as an Individual

v.

The UNITED STATES.

No. 46–67.

United States Court of Claims.

July 15, 1970.

As Amended Oct. 2, 1970.

Arthur J. Rooks, Birmingham, Mich., attorney of record for plaintiff Algonac Mfg. Co., John A. Maxwell, pro se.

James A. Pemberton, Jr., Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

This suit was filed on February 21, 1967, by John A. Maxwell, *pro se*, acting for himself and for Algonac Manufacturing Company, a corporation of which Maxwell was President and the sole stockholder. Mr. Maxwell is not an attorney. Notwithstanding this fact, he admits he wrote the original petition for himself and his company, although it was approved and signed by his then attorney, John Safran. (See page 7 of the Amended Petition discussed below.) The government filed a motion to dismiss the suit. The court entered an order on July 10, 1967, in which we concluded that the petition failed to comply with Rules 13(a), 14(b) (3), 15(b), 17 (a), (b) and (d), and 24(a) of this court (1964 ed.) which require that pleadings be simple, concise and direct; that allegations of arbitrary and capricious action be stated with particularity; that averments be made in numbered paragraphs, each of which is to be limited to a single set of circumstances; that each claim be based on clear and concise statements of fact; that any actions by Government agencies and other courts be set forth; that the substance of those portions of the contract relied upon be pleaded or appended to the petition; that the action be prosecuted in

the name of the real party in interest; that petitioner not plead evidence or conclusions of law nor aver matters in an argumentative manner, and that the petition avoid repetition, be concise, direct and set forth the salient facts pertinent to each claim in consecutively numbered paragraphs.

The court granted plaintiff 60 days to file an amended petition complying with the rules of the court, whereupon defendant's motion to dismiss would be denied and the case returned to the trial commissioner for further proceedings, but failing which defendant's motion to dismiss would be granted and the petition dismissed.

Thereafter, the said Maxwell filed a motion to substitute himself, a non-lawyer, as the attorney for such company inasmuch as its two prior attorneys, John Safran and Malcom P. McGregor had withdrawn from the case. At the same time, acting *pro se* and for the company he wrote, signed, and filed an amended petition. The court entered an order on April 12, 1968, directing that the amended petition be filed, that Maxwell's motion to be substituted as an attorney for Algonac Manufacturing Company be denied, because he was not an attorney, but granting the company 60 days to obtain the services of an attorney of the bar of this court, that Maxwell be allowed to represent himself *pro se*, and denying defendant's motion to dismiss the original petition without prejudice to the filing of an amended motion directed to plaintiffs' amended petition.

The defendant filed a motion to dismiss plaintiffs' amended petition which was considered by the court on November 1, 1968. On that date the court entered an order reciting that to avoid further delay, the defendant's motion to dismiss was denied without prejudice and without passing upon the sufficiency of plaintiffs' amended petition, or any part thereof, to state a cause of action

within the jurisdiction of the court, and remanded the case to the trial commissioner for pretrial, trial, or such other proceedings as he deemed necessary to expedite the disposition of the case.

It was contemplated by the court that the trial commissioner would require the plaintiffs to file a petition that complied with the rules of the court and would thereafter conduct whatever trial or other proceedings that might be necessary. However, several events transpired which prevented carrying out this orderly process. Mr. Arthur J. Rooks, an attorney who is a member of the bar of this court, filed a motion to be substituted as the attorney of record for Algonac Manufacturing Company, which was granted by the court on June 17, 1968. Said attorney later (May 5, 1969) filed a motion for partial summary judgment on the claim of the company for storage charges in connection with the ninth (armor plate) contract, which claim will be fully discussed below. The government then filed a motion for summary judgment on the whole case. These motions had the effect of returning the case to the court for a decision even though no amended petition had ever been filed that complied with the rules of the court and no amended petition had been filed for the company by an attorney, all of which is shown below.

In addition to the defects in the amended petition which are pointed out above, it should be mentioned that it is exceedingly long (88 pages, plus exhibits), is replete with trivia, philosophy, criticism of the government and its employees generally, rancor and bitterness, and verbose redundant statements that add nothing to the case but actually detract from it. The following allegations in the amended petition are typical:

61. Before this epic of lament is brought to a close Plaintiffs wish to submit that if there seems to be bit-

terness in Plaintiffs' expression it must be remembered that injustice breeds bitterness. That 14 years of privation and humiliation erode the spirit but the acute pain from deep wounds do not dull with the passage of time. This is not intended as a tirade against the government, per se, as the United States of America; nor is it intended as a phillipic [sic] against our system of democracy and justice. It is a declamation against those individuals upon whom the government must, inescapably, bestow the trappings and powers of authority who accept it *without humility*, and *without native ability*, who turn upon unsuspecting and defenseless citizens, terrorizing and devasting, behind the insuperable shield of strength that is government, masking the transgressions that are the offsprings of their mediocrity and inferiority. It is a declamation against and denouncement of those amoral lackeys that immerse themselves into the vast deeps of the government, and, there lurking, employ every device of trickery, ambuscade, gossip and perversity to gratify their deceitful, uneasy natures and state their uncertain egoes, by preying upon the public.

\* \* \* \* \* \*

Up to now, Plaintiffs have patiently constrained themselves to observing all of the amenities of civility and politeness as reasonable and intelligent men behave towards others, but this approach made it easier for their detractors, who have no qualms about dirty tactics, to stomp upon them almost to their deaths. The time now has come to retaliate in kind, an eye for an eye, a tooth for a tooth, and to call the spade black, rather that [sic] slightly smuged, [sic] putting aside the language of the dilletante, [sic] and be blunt.

The proper procedure would be for the court to require the attorney of record to prepare and file an amended petition that complies with the rules of the court, and, should he fail to do so, dismiss the case. However, after spending many hours trying to understand the illogical, ill-arranged and verbose petition filed by the plaintiffs in this case, the court has decided that to require a proper amended petition to be filed by the attorney at this stage would only serve to delay the case further, and the court has elected to hand down an opinion. It should be emphasized, however, that this procedure will not serve as a precedent and the court will require strict compliance with its rules in any future case where this problem arises. This controversy began in 1952 and the court feels that it should be decided and disposed of now, although it has been pending in this court only since 1967. Accordingly, we will proceed to discuss the issues in the case.

Algonac Manufacturing Company will be referred to hereafter as plaintiff or Algonac. The said John A. Maxwell will be called plaintiff Maxwell or Maxwell.

### The Eight Terminated Contracts

This first portion of plaintiff's case centers around eight defense contracts. Plaintiff, as contractor, entered into these contracts with the Detroit Ordnance District (DOD), at a total dollar value of $1,431,226.72.[1] The contracts were for the building of various items, such as tool boxes, cabinets and benches, and contained the standard disputes clause, and clauses for termination for default and for the convenience of the government.

The contracts were terminated for default because of delays, a termination which plaintiff vigorously protested. Subsequently, the contracting officer found the delays were excusable, and extended the time limits for completion.

However, on November 25, 1953, the day after the extensions were granted, plaintiff was informed that the contracts were being terminated for the convenience of the government. A lump sum settlement was proposed, and plaintiff at that time sought a partial payment of $430,033.24. A down payment of $200,000.00 was made on December 22, 1953. Soon after this, plaintiff presented three settlement proposals: a claim for $531,477.08 (less the $200.00 paid on account) on January 6, 1954; a claim for $503,170.02 (less the amount paid on account) on February 2, 1954; and a claim for $518,183.57 (less amount paid on account) on March 31, 1954.

Negotiations were begun, using the March 31 proposal as a starting point. The Army Audit Agency investigated plaintiff's proposal and made two reports to the DOD. The Contracting officer rejected the March 31 proposal on April 15, 1954, but notified plaintiff that the door was still open for discussion. Soon thereafter, on April 28, 1954, DOD notified plaintiff that they had "been directed by higher echelon to discontinue negotiations."

The reason for this termination of negotiations became clear when the next development in the history of this case occurred; this was the presentation of Algonac Manufacturing Company and John A. Maxwell to the grand jury on charges of fraud, based on reports made by the DOD to "higher echelon." Two indictments were returned. Algonac and Maxwell were indicted and convicted in the district court on portions of four counts of the second indictment, the first indictment having been dismissed.

However, the conviction was reversed by the United States Court of Appeals for the Sixth Circuit on March 29, 1960.[2] Subsequently, a civil suit, which had been filed earlier by the government to recover double the $200,000 paid on account, was dismissed.

Action was resumed on plaintiff's contract claims on May 19, 1960. Plaintiff's then attorney wrote the DOD requesting resumption of negotiations based on plaintiff's March 31, 1954 proposal for settlement ($518,183.57). A meeting was held, a new audit was performed, and plaintiff's attorney was notified that further negotiations were in order. The last letter expressing willingness to continue negotiations was sent to plaintiff's attorney by the government on October 26, 1960. Nothing further occurred until 1964.

Plaintiff and Maxwell visited DOD on January 17, 1964, and left a settlement proposal called "Final Determination Claim," dated May 19, 1960—January 31, 1963, with the agency. The Army Audit Agency reviewed this revised settlement proposal, and subsequently advised plaintiff that it was ready to continue negotiations. Plaintiff wrote to DOD on August 24, 1964, stating that DOD would be notified of a suitable date on which to meet. On October 6, the contracting officer notified plaintiff that he would proceed to make a decision on the basis of existing information, unless additional data was presented to him by October 26, 1964. Plaintiff wrote the contracting officer on November 27, 1964, stating that it was in the process of compiling additional data, which would be submitted on December 15, 1964, and asking that it be allowed to

---

1. The contract numbers and dates of award are as follows:

| Contract Number | Date of Award |
| --- | --- |
| 10179 | 6/20/52 |
| 10648 | 6/25/52 |
| 11393 | 6/26/52 |
| 11423 | 6/30/52 |
| 11688 | 6/30/52 |
| 12122 | 6/30/52 |
| 13468 | 9/12/52 |
| 13976 | 11/20/52 |

2. The opinion of the Court of Appeals, which discusses in detail the fraud prosecution, is reported in Maxwell v. United States, 277 F.2d 481 (6th Cir. 1960).

file it at that time. This request for extension of time was denied by the contracting officer on December 1, 1964, and on that same day he made his findings and determinations. In essence, he found as follows:

1. The "Final Determination claim" filed by plaintiff on January 17, 1964, was not acceptable as a termination settlement proposal, because such claim was not set forth on the prescribed forms, was not signed, and was not certified.

2. The final settlement proposal of March 31, 1954, was the most recent settlement proposal in proper form.

3. Plaintiff was entitled to a total settlement of $219,154.98. Deducting the $200,000 previously paid on account, this left a balance due plaintiff in the sum of $19,154.98.

Plaintiff appealed the contracting officer's decision to the Armed Services Board of Contract Appeals (ASBCA) on December 30, 1964. On appeal, the Board took into consideration plaintiff's March 31, 1954, settlement proposal, plaintiff's January 17, 1964 "Final Determination Claim," the contracting officer's decision, and the testimony and the briefs of the parties.

The Board decision, 66–2 BCA ¶ 5731, ASBCA No. 10534, dated August 1, 1966, increased plaintiff's amount of recovery from the $219,154.98 figure granted by the contracting officer to a total figure of $479,264.01. The following table shows the itemized amounts, and compares the amounts granted by the contracting officer and the Board:

| Item | C/O Decision | Board | Difference |
|---|---|---|---|
| Metals | $65,611.81 | $74,825.10 | +$9,213.29 |
| Purchased Parts | 9,489.40 | 9,489.40 | |
| Work in Process | 8,629.44 | 10,600.76 | +1,971.32 |
| Dies, Labor, Overhead | 81,602.12 | 252,355.72 | +170,753.60 |
| Total Cost of Sales | $165,332.77 | $347,270.98 | +$181,938.21 |
| G & A | 21,708.19 | 56,466.26 | +34,758.07 |
| Profit | 10,457.20 | 24,224.23 | +13,767.03 |
| Settlement Exp | 9,544.04 | 39,189.76 | +29,645.72 |
| Settlements With Subcontractors | 9,930.78 | 9,930.78 | |
| Acceptable Finished Product | 2,182.00 | 2,182.00 | |
| Total Settlement | $219,154.98 | $479,264.01 | $260,109.03 |

Subtracting the $200,000 paid on account in 1953 from the $479,264.01 allowed by the Board resulted in a net amount due plaintiff in the sum of $279,264.01.

Plaintiff's financial problems, however, were still far from being over. In October 1960, the Internal Revenue Service had notified the commanding officer of the DOD that plaintiff was indebted to the United States for Federal taxes, penalty and interest, and requested that any funds due the plaintiff be forwarded to the IRS to be applied on the tax indebtedness. The Department of the Army issued a directive stating that no contract funds were to be disbursed to plaintiff until its tax in-

debtedness was cleared up. Accordingly, on January 4, 1967, the Army paid the $279,264.01 awarded to plaintiff to the IRS along with $2,539.54 due plaintiff on the ninth contract discussed below. These two payments in the total sum of $281,803.55 paid all of plaintiffs taxes, penalty and interest for 1952 and 1953, except the sum of $21,790.14 accrued interest for 1953 which was not paid. Plaintiff Maxwell and wife Rene A. Maxwell owed taxes, penalty and interest in the sum of $65,421.16 for 1951 and 1952, which was not paid.[3]

Algonac and plaintiff Maxwell filed this suit February 21, 1967, appealing from the decision of the ASBCA on the eight contracts, and including a claim for storage under the ninth contract and a balance of $2,539.54 due on such contract, together with many other claims that will be discussed below.

Some of these claims directly involve the eight contracts discussed above, and some of them are at most peripheral to the contracts. The failure of the plaintiffs to retain an attorney to write their petition and briefs has made the court's task of deciphering, setting out, analyzing and deciding these claims a most difficult one. There is no logical or systematic arrangement of the pleadings and briefs that show or present the complaints of the plaintiffs in a simple, concise and direct manner. The most that can be said of plaintiff's pleadings and briefs is that, taken as a whole, they seem to add up to a general statement to the court substantially as follows:

We don't like what has happened in this case and we ask you to search the entire record, find the errors, correct them, and then award us a judgment.

 It goes without saying that a court is not required to search the record for errors that may be lurking among the labyrinths of voluminous records. This is a task that is imposed

upon the complaining parties and their attorneys. If they do not perform it, the court is justified in assuming that no errors have been made. We said in Williamsburg Drapery Co. v. United States, 369 F.2d 729, 732, 177 Ct.Cl. 776, 781–782 (1966):

* * * The court has often said that contractors should be specific in challenging the findings of a board, and that the court cannot be expected to plough through a record for itself without adequate record references and sufficiently detailed challenges to the administrative findings. * * *[4]

Again, in Sundstrand Turbo v. United States, 389 F.2d 406, 422–423, 182 Ct.Cl. 31, 60 (1968), we said:

* * * [T]he plaintiff has the burden of establishing the fact that the record does not support the Board's finding. This it has failed to do. It is not the court's function to supply this deficiency by an independent excursion along the administrative trial. * * * [Cases omitted.]

Nevertheless, we have waded through the many pages of allegations, accusations and verbose ramblings which constitute Maxwell's and Algonac's pleadings and briefs, and from all this have compiled a list summarizing what appear to be the claims that are presented to the court. They are as follows:

1. Torts have been committed by defendant against Maxwell and plaintiff Algonac Manufacturing Company.

2. The payment of plaintiff's award to the IRS by the Army was unauthorized and the award should now be paid to plaintiff.

3. A decision of the Renegotiation Board should be overturned.

4. A district court judgment against Algonac should not be allowed as a set-off against any recovery in this case.

---

3. See letter from A. M. Stoepler, District Director, Internal Revenue Service, Detroit, Michigan, dated March 15, 1967 (Exhibit D–5).

4. See other cases cited in footnote 3, 369 F.2d at 732, 177 Ct.Cl. at 782.

5. The decision of the ASBCA on the eight contracts is wrong and should be overturned by the court.

6. Plaintiff is entitled to storage charges and a balance due in connection with the "ninth contract."

We will discuss these claims, along with the defenses pleaded by the government, in the order they are set out above.

■ But, at the outset, we must decide the threshold question pertaining to the government's affirmative defense that Maxwell is not a proper party to the suit. Our Rule 61(a) (formerly 24 (a)) requires that "Every action shall be prosecuted in the name of the real party in interest; * * *." Our orders of July 10, 1967, and April 12, 1968, *supra*, referred to this requirement. The contracts which serve as the basis for the claims in this case were between the government and Algonac Manufacturing Company. John A. Maxwell was not a party to the contracts. Therefore, on all claims which involve the contracts, we hold that Maxwell is not a proper party to the suit, and we do not have jurisdiction of his petition. Accordingly, his petition covering all contract claims is hereby dismissed.

### Tort Claims

Many of the claims in the petition are tort claims. Some torts were allegedly committed by defendant against Maxwell, and some against Algonac. The following is a list of the torts alleged for which they claim damages:

1. Wrongful prosecution.

2. Libel.

3. Defamation.

4. Institution of wrongful civil proceedings.

5. Conversion.

In addition, Maxwell and Algonac seek damages for unnamed torts committed by the government, which resulted in the following:

1. Ruined reputation.

2. Loss of Maxwell's salary.

3. Loss of Maxwell's home.

4. Losses from damages to the Algonac plant.

5. Losses from forced sale of Algonac's equipment and machinery.

6. Loss of good will.

7. Loss of profits.

■ This court has no original jurisdiction over tort claims, either under 28 U.S.C. § 1491 (1964) or otherwise. Numerous decisions of the Supreme Court and of this court have so held. *See* Schillinger v. United States, 155 U.S. 163, 167–169, 15 S.Ct. 85, 39 L.Ed. 108 (1894), and Benjamin v. United States, 348 F.2d 502, 510–511, 172 Ct.Cl. 118, 128 (1965). Therefore, all the tort claims of Maxwell and Algonac Manufacturing Company are dismissed.

### Payment of the Board Award of $279,264.01 to the Internal Revenue Service

■ The plaintiff complains that the payment of the $279,264.01 awarded by the Board was paid to the Internal Revenue Service without authority and it should be ordered paid to the plaintiff. This and any other tax claim alleged by plaintiff must fail. The Internal Revenue Code of 1954, Section 7422(a), states:

(a) No Suit Prior to Filing Claim for Refund.—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.

Filing of a claim in accordance with this provision of the Code is jurisdictional. Pechette v. United States, 145 Ct.Cl. 189, 193 (1959). Nowhere in

plaintiff's pleadings is the filing of such a claim alleged.

■ In addition, the government was well within its rights in paying the Board award to the IRS. "The government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'" United States v. Munsey Trust Co., 332 U.S. 234, 239, 67 S.Ct. 1599, 1601, 91 L.Ed. 2022 (1947).

### The Renegotiation Board Decision

■ On February 14, 1956, Algonac was assessed $40,000, deemed to be excessive profits for the fiscal year ending February 29, 1952, by the Renegotiation Board. Section 108 of the Renegotiation Act, 50 U.S.C.App. § 1218 (1964), 65 Stat. 7, 21, sets out the appellate process for those who are aggrieved by a decision of the Renegotiation Board. Review is by the Tax Court. Plaintiff cannot have the Renegotiation Board decision overturned in this court as we do not have jurisdiction of a claim of this kind. We held in Alloy Prods. Corp. v. United States, 302 F.2d 528, 529, 157 Ct.Cl. 376, 378 (1962): "* * * [W]e believe there is no doubt that the exclusive jurisdiction is within the Tax Court to set aside or reform agreements entered into pursuant to the Renegotiation Act, * * *."

### Set-Off of the District Court Judgment

■ The government sued Algonac in the United States District Court for the Eastern District of Michigan to reduce to judgment the amount determined by the Renegotiation Board to be excessive profits. (United States v. Algonac Manufacturing Co., Civil No. 15904.). On September 29, 1958, judgment was entered for the United States against Algonac in the amount of $40,-000, which was amended on October 15, 1958, to the amount of $44,080 plus legal interest from said date. 28 U.S.C. § 1503 (1964) states:

The Court of Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court.

The defendant claims the right of set-off of the above judgment against any recovery by plaintiff in this case, which plaintiff opposes. Clearly the set-off is justified and is allowed.

### The Board Decision on the Eight Contracts

At the time defendant moved for summary judgment (June 4, 1969), plaintiff's pleadings did not point to specific errors of either fact or law in the ASBCA decision, nor was there an indication of how the Wunderlich Act (41 U.S.C. §§ 321, 322) was involved in the relief sought by plaintiff. However, plaintiff filed an additional brief on December 22, 1969, in which broadside attacks, however vague, were made on the Board decision. Its attacks were:

1. Testimony of certain government accountants was hearsay.

2. The Board improperly took into consideration the March 31, 1954, settlement proposal.

3. The finding of a 103.3% overhead rate was capricious and arbitrary.

4. Plaintiff's direct labor claim should have been accepted.

5. The general and administrative expenses rate found by the Board was arbitrary and capricious.

6. The Board's finding on reasonable cost of settlement was arbitrary and capricious.

7. Claims for costs incurred due to shipping by rail have not been settled previously.

8. Settlement costs determined by the Board were arbitrary and capricious.

9. A group of 210 tool boxes was not rejected by the government.

10. The convenience termination clause was improperly invoked for payment in lieu of profit, and was

an arbitrary and capricious juggling of figures.

11. There is no testimony in the record to support the Board statement that it had considered a price analyst's figures on a weighted average price.

12. Plaintiff was deprived of its records by defendant.

13. The Board improperly rejected $40,000 as part of plaintiff's expediting costs in purchasing metals during the steel strike.

14. The Board improperly rejected plaintiff's claim for loss of equipment.

Plaintiff has failed to conform to our Rule 162(a) (formerly 95(a)) which requires: "Every petition founded on a contract containing a disputes clause shall make clear the relationship, if any, of the Wunderlich Act to the relief sought. * * *" Plaintiff made no attempt to comply with this Rule, except to say:

ASBCA was in utter violation of Mr. Wunderlich's vision of the outcome of internally constituted, self-motivated government boards that are incestuous and always self-protective to their counterparts in the self-same government.

We have again laboriously examined plaintiff's pleadings, particularly the brief filed December 22, 1969, to closely scrutinize this part of the case. We note that most of the Board's conclusions on the above matters complained of by plaintiff were decisions of fact, not of law. Therefore, unless such decisions on the facts are not supported by substantial evidence, they are entitled to finality. We held in Williamsburg Drapery Co. v. United States, 369 F.2d 729, 739, 177 Ct.Cl. 776, 793 (1966):

* * * To the extent that * * * problems are decided on the basis of evidence, the ASBCA view of the evidence must be upheld if substantially supported.

We conclude that the record shows that the decision of the Board was supported by substantial evidence and that it was neither arbitrary nor capricious and is correct on the facts and on the law, is entitled to finality, and it is hereby affirmed.

### The Ninth (Armor Plate) Contract

In addition to the eight contracts described above that were terminated by the government and which were involved in ASBCA No. 10534, the plaintiff Algonac entered into a ninth contract with the government, being contract No. DA–11–070–ORD–7795, which is sometimes referred to as the armor plate contract. This contract called for the production by plaintiff of 300 gun-carriage parts sets requiring armor plate of $\frac{1}{4}$, $\frac{3}{4}$ and $1\frac{1}{8}$ inches in thickness. Due to the fact that armor plate of these thicknesses was difficult to obtain, the government agreed to furnish it to the plaintiff to be used in executing the contract. An amendment to the original contract was signed by the parties as Supplemental Agreement No. 2 which provided for the furnishing of the armor plate by the government. The provisions of this supplemental agreement will be described in more detail in the following paragraphs.

The government delivered the armor plate to the plaintiff at its factory as agreed and the plaintiff began production under the contract. All work was completed according to the terms of the contract on November 9, 1953, on which date the last shipment of the manufactured products was forwarded to the government by the plaintiff. At the same time, plaintiff furnished the government its statement or invoice No. 4558 for the remaining unpaid balance due on the contract in the sum of $2,-539.54. The plaintiff says this balance has never been paid to it by the government and sues here for its recovery, plus interest thereon at the rate of six percent per annum since November 9, 1953. The defendant says this claim is barred by the statute of limitations, 28 U.S.C.

§ 2501 (1964), which requires the filing of a suit in this court within six years from the time a cause of action accrues. We think the defendant is correct. The plaintiff admits that the debt became due November 9, 1953. The suit was not filed until February 21, 1967, which was more than thirteen years after the debt became due. There is nothing that tolled the statute of limitations during this long period of time. The plaintiff has attempted to show that the ninth contract was a part of its appeal to the ASBCA in No. 10534, but this was clearly not the case. We conclude that plaintiff's claim for the balance of $2,539.54 is barred by limitations.

Even if the above claim was not barred by limitations, plaintiff would still be unable to recover it in this suit for the compelling reason that the $2,539.54 has been paid by defendant to the Internal Revenue Service for the account of the plaintiff and it has been applied on income taxes owed by plaintiff to the government. The plaintiff admits this to be true, but says it did not consent to payment being made in this fashion and that the government was without authority to credit the payment on its taxes. We do not agree. The government had a right to offset its tax claim against the debt it owed the plaintiff. It is immaterial that plaintiff's contract was with the Department of Defense (U. S. Army) and the offset was made by the Internal Revenue Service. It goes without saying that each of these agencies is a part of the same government and a debt owed to either of them is a debt owed to the government. The application of the payment to plaintiff's income tax was proper and was as effective in discharging the government's debt to the plaintiff as a payment made directly to the plaintiff would have been. The plaintiff has received the benefit of the payment and is not entitled to recover it again. Furthermore, the plaintiff has not filed a claim with the IRS for a refund of this $2,539.54, which is a prerequisite to his claiming a refund in this court. Section 7422(a) Internal Revenue Code of 1954; Pechette v. United States, *supra*. Therefore, this court cannot consider any claim by plaintiff for a refund of this payment to the IRS.

 The plaintiff contends that in any event it is entitled to be paid interest on the above debt from the time it became due on November 9, 1953, up to the present time.[5] It reasons that since the government charges interest to anyone owing it money, it is nothing but right for the government to pay plaintiff interest on the debt it owed the plaintiff. Unfortunately for the plaintiff, this question cannot be decided on the basis of what appears to the plaintiff to be right and wrong. We must decide it according to law. Congress enacted 28 U.S.C. § 2516(a) (1964) to govern this situation. It provides:

(a) Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims *only* under a contract or Act of Congress *expressly providing for payment thereof*. [Emphasis supplied.]

*See* United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 590, 67 S.Ct. 398, 91 L.Ed. 521 (1947); United States v. N. Y. Rayon Importing Co., 329 U.S. 654, 659, 67 S.Ct. 601, 91 L.Ed. 577 (1947).

There is no provision in the contract before us that requires the government to pay interest. Therefore, we hold that the plaintiff cannot recover interest on this claim.

This leaves only the plaintiff's claim for storage of the unused armor plate furnished by the government that was left at Plaintiff's plant after the contract was completed on November 9, 1953. The facts giving rise to this claim are generally as follows. The plaintiff alleges that about thirty days prior to finishing the contract, it notified the

---

5. The money was paid to the Internal Revenue Service on January 6, 1967, to be applied on plaintiff's taxes.

government that some of the government furnished property would be left on hand unused and asked for instructions as to its disposition. This inquiry was answered by letter of J. Flanigan, Assistant Property Administrator, dated October 2, 1953, in which were enclosed several forms to be used by plaintiff in requesting disposition of this property (Exhibit G–1). The plaintiff executed the forms on October 28, 1953, and returned them to the government. These forms consisted of an "Application For Disposition of Government-owned Property" and contained schedules showing 2,990 pounds of armor plate ¾ inch and 1¼ inch thick and from 23 to 60 inches wide and from 64 to 122 inches long. The application also contained inquiries in subparagraph (b) as follows:

* * * (2) The amount of space required to store the items, (3) The amount of adequate storage space available at our plant [plaintiff's plant] therefor. [Exhibit G–2.]

This application and schedule was stamped received by the government on November 3, 1953, and their receipt was acknowledged by letter dated November 4, 1953, from Richard J. Solomon, Chief, Cont. Inv. Sect., Property Disposal Branch, General Office Division of the Detroit Ordnance District (Exhibit G–3). On May 24, 1954, plaintiff wrote Colonel E. D. Mohlere, Deputy District Chief of the Ordnance Corps of the above district, advising him plaintiff had been trying to return the armor plate to the government since October 28, 1953, but had not been able to do so, and requested him to have the property removed. (Exhibit G–4). Colonel Mohlere replied by letter of June 9, 1954, acknowledging receipt of plaintiff's letter and stating "It is expected that a decision will soon be reached concerning the disposition of several pieces of Armour Plate." (Exhibit G–5.) On August 3, 1954, plaintiff again wrote Colonel Mohlere inquiring when the armor plate could be removed. (Exhibit G–6.) The plaintiff wrote the district again on August 16, 1954, saying it could not understand why the government did not remove the property, describing it, and asking that it be removed. (Exhibit G–7.) Nothing more was heard from the government by plaintiff until March 8, 1963, when one Selwyn T. Asquith, Contracting Officer, issued what he called "Contracting Officer's Findings and Determination" in which he stated:

2. * * * I hereby determine that:

It is to the best interest of the Government to consider the Armor Plate to have been abandoned by the Government at Algonac Manufacturing Company and the items should be removed from the property records of the District accordingly. [Exhibit G–8.]

On April 17, 1964, plaintiff advised the government he was charging storage at the rate of $100 per month for the armor plate, and on August 11, 1964, it sent an invoice for such storage from September 1, 1954, through July 31, 1964 (119 months at $100 per month) in the total sum of $11,900 (Exhibit G–10). The payment of these charges was refused by Lt. Colonel B. V. D. Farris, Contracting Officer, Ordnance Corps, in writing on October 26, 1964, on the grounds that the armor plate had been abandoned by the government, the storage charges were exorbitant, and there was no storage agreement between the contractor and the government which required the government to pay storage. (Exhibit G–11.)

Notwithstanding the alleged abandonment of the armor plate by the government in 1963, Mr. C. Woznicki, Acting Chief, Components Branch, Procurement and Production Division, Detroit Procurement District, U. S. Army, wrote the plaintiff on February 5, 1965, that the district desired to remove the armor plate as soon as possible and proposed to send a representative to plaintiff's plant to survey the magnitude of the job and to determine equipment requirements. Again, on March 17, 1965, Mr. Woznicki wrote plaintiff summarizing events that had occurred since the date

of his last letter. He pointed out that a meeting was held in his office on February 12, 1965, between him and a representative of the plaintiff where it was agreed the government would remove the armor plate on March 1, 1965, but due to a snowstorm the removal date was postponed until March 10, 1965. On March 9, 1965, plaintiff advised Mr. Woznicki he could not remove the armor plate until and unless the government paid the storage charges. Mr. Woznicki concluded his letter by saying the parties had reached an impasse on the matter. He said further:

> The action of barring the government from removing the armor plate would appear to preclude Algonac from accumulating further claims against the government for alleged storage charges.

The government submitted plaintiff's claim for storage charges to the General Accounting Office for determination. It disallowed the claim in a written opinion dated February 9, 1964, saying there was no agreement for storage charges, the armor plate had been abandoned by the government, and the material had been ground down in size so as to make it useless to the government,[6] and there was no evidence plaintiff ever proposed making a storage charge during the 10 years the material had been at plaintiff's plant. It concluded by saying:

> On the present record, the validity of your claim is at best open to doubt, and, hence, it is considered as not established. The accounting officers of the government are not authorized to certify for payment claims of doubtful validity.

The armor plate is still in plaintiff's factory where it has been since the contract was completed on November 9, 1953, a period of over 16 years. Plaintiff's storage claim has never been paid

and it seeks recovery of same in this case.

The foregoing facts have been described in detail at the risk of being tedious, but it has appeared to be necessary for a comprehensive consideration of the problem before us.

 The defendant says that we do not have jurisdiction of plaintiff's claim because it did not appeal to the ASBCA and thereby failed to exhaust its administrative remedies. The plaintiff alleges that it tried to get the ASBCA to consider this claim along with those involving the eight terminated contracts, but the ASBCA refused to do so, saying it had no jurisdiction over the claim. All that we have before us in this regard is what plaintiff says about it, which is very general and uncertain. We have not been furnished with any reference to the record that supports plaintiff's contentions. The decision of the ASBCA does not indicate that it ever considered this claim. However, we think it is immaterial whether plaintiff appealed his claim to the ASBCA. The contract did not provide for storage charges and plaintiff could not have obtained relief under the contract. Under these circumstances, it was not required to appeal to the Board. Furthermore, the Board would not have had jurisdiction of the claim. We conclude that defendant's contention in this regard is not correct.

 The defendant further contends that if plaintiff has a claim for storage, it is barred by the six-year statute of limitations applicable to cases in this court,[7] because the storage began on November 9, 1953, more than six years before this case was filed on February 21, 1967. It is clear that plaintiff's claim is a continuing one. The entire claim for 16 years storage could not have accrued on November 9, 1953, because at that time no storage had occur-

---

6. The plaintiff denies that the armor plate had been ground down in size and says that it is still in the same condition it was in when delivered.

7. 28 U.S.C. § 2501 (1964).

red and no one knew whether there would be any storage of the material, and, if so, how much there would be. If plaintiff has a valid storage claim, it accrued each month during the period of storage and became barred by limitations six years thereafter. We conclude that only that part of the plaintiff's claim which accrued more than six years prior to February 21, 1967, the date this suit was filed, is barred by limitations, and the remainder is properly before the court.

▮▮▮▮ This brings us to the ultimate question of whether or not the plaintiff has a valid claim for storage upon which it is entitled to recover. Its pleadings are most unsatisfactory. We are unable to determine accurately whether plaintiff seeks to recover storage under the express terms of the contract. If this is the case, it is not entitled to recover because the contract does not by its terms require the government to pay storage. Where suit is filed on an express contract, recovery cannot be had on another ground, such as on an implied contract unless the implied contract is pleaded in the alternative. This is true because as a general rule there can be no implied contract where there is an express contract between the parties covering the same subject. 17 C.J.S. Contracts § 5 (1963). If the plaintiff is to recover on this claim, it must do so on the basis of an implied contract. It is highly doubtful if plaintiff has adequately pleaded the existence of an implied contract. It is not alleged in its petition but is mentioned in its brief in support of its motion for summary judgment. In order to dispose of the case, we have concluded that we will consider that plaintiff has presented a claim on an implied contract. However, in so doing, we must decide whether its claim is based on a contract implied in fact or implied in law. There is a difference, as shown by the Supreme Court in Baltimore & Ohio RR v. United States, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923) when it said:

The "implied agreement" * * * is not an agreement "implied in law," more aptly termed a constructive or *quasi* contract, where, by fiction of law, a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress, but an agreement "implied in fact," founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding. * * *

Again, in Klebe v. United States, 263 U.S. 188, 44 S.Ct. 58, 68 L.Ed. 244 (1923), aff'g 57 Ct.Cl. 160 (1922), the Supreme Court said:

* * * A contract implied in fact is one inferred from the circumstances or acts of the parties; but an express contract speaks for itself and leaves no place for implications. * * * [*Id.* at 192, 44 S.Ct. at 59.]

The distinction between contracts implied in fact and implied in law has been defined in 17 C.J.S. Contracts § 4 (1963) as follows:

* * * Thus a contract implied in fact is a true contract, the agreement of the parties being inferred from the circumstances, while a contract implied in law is but a duty imposed by law and treated as a contract for the purposes of a remedy only. Another distinction * * * lies in the fact that, * * * in the case of contracts implied in fact, there must be an assent of the parties, as in express contracts, whereas * * * in the case, of contracts implied in law, or, more properly, quasi or constructive contracts, such element of assent is lacking.

The distinction has also been stated that a contract implied in fact is an implied contract in which the intention is ascertained and enforced, while a contract implied in law is a mere fiction, the intention being disregarded, and the quasi contractual ob-

ligation being imposed by law to bring about justice, without regard to the intention of the parties. * * *

 This court does not have jurisdiction of claims based upon contracts implied in law. The Supreme Court said in Merritt v. United States, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925):

* * * The Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law. * * *

See also J. C. Pitman & Sons v. United States, 317 F.2d 366, 161 Ct.Cl. 701, 704–705 (1963) and cases there cited. This court does have jurisdiction of claims based on contracts implied in fact. See New York Mail & Newspaper Trans. Co. v. United States, 154 F.Supp. 271, 276, 139 Ct.Cl. 751, 759 (1957), cert. denied, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260.

If the plaintiff is to recover here, its recovery must be on a contract implied in fact, because as stated above, we do not have jurisdiction of a claim based on a contract implied in law. Here again the plaintiff's pleadings are very meagre and scarcely meet the specificity required by our rules. But, to dispose of the case, we will consider that its pleadings, considered as a whole, barely meet the essentials of asserting a claim based on a contract implied in fact. This requires us to again look at the facts and the conduct of the parties to see if there was a contract implied in fact that requires the government to pay the storage charges claimed by the plaintiff that are not barred by limitations.

 We look first at the contract. Supplement No. 2 was added to the contract on August 21, 1952, for the purpose of adding government-furnished articles and to provide for the furnishing by the government to the plaintiff of armor plate steel to be used in fulfilling the contract. This Supplement No. 2, which became a part of the contract, provided that the government would furnish to plaintiff the armor plate necessary to execute the contract, and contained various provisions with reference to such armor plate. It provided in paragraph 30(c):

(c) Title to the Government-Furnished property shall remain in the Government. * * * The Contractor shall maintain adequate property control records of Government-Furnished property * * *.

Paragraph 30(d) and (e) provided:

(d) The Government-Furnished property shall, unless otherwise provided herein, be used only for the performance of this contract.

(e) The Contractor shall maintain and administer, in accordance with sound industrial practice, a program for the maintenance, repair, protection and preservation of Government-Furnished property, until disposed of by the Contractor in accordance with this clause. * * *

Paragraph 30 further provided:

(f) (i) Except for loss, destruction or damage resulting from a failure of the Contractor due to willful misconduct or lack of good faith of any of the Contractor's managerial personnel as defined herein, to maintain and administer the program for the maintenance, repair, protection and preservation of the Government-Furnished property, as required * * * [by this agreement], the Contractor shall not be liable for loss or destruction of or damage to the Government-Furnished property * * * [caused by certain designated perils].

* * * * * *

(v) * * * [T]he Government-Furnished property * * * shall be returned to the Government in as good condition as when received by the Contractor in connection with this contract, * * *.

* * * * * *

(h) Upon the completion of this contract, or at such earlier date as may be fixed by the Contracting Officer,

the Contractor shall submit, in a form acceptable to the Contracting Officer, inventory schedules covering all items of Government-Furnished property not consumed in the performance of this contract (including any resulting scrap), or not theretofore delivered to the Government, and shall deliver or make such other disposal of such Government-Furnished property, as may be directed or authorized by the Contracting Officer. * * *

In view of the duties, responsibilities, and obligations imposed on the plaintiff by the foregoing provisions to maintain, repair, protect, and preserve the armor plate as long as it was in its possession, it was reasonable for the plaintiff to conclude, after the contract was finished and it had requested the government several times in writing, as outlined above, to take possession of the property and the government failed to do so, that the government wished it to continue to care for, preserve, and store such property and that the government would pay it for doing so. It will be recalled that in the Application for Disposition of Government-Owned Property (Exhibit G–2) the plaintiff sent to the government on October 28, 1952, the plaintiff was asked to indicate on this government-furnished form the amount of storage space required to store the items and the amount of storage space available for such purposes at plaintiff's plant. This indicated that the government would either remove the property or store it at plaintiff's factory. In effect, it did the latter. We conclude from this inquiry, and from the provisions of the contract and the other facts outlined herein, that there was an agreement implied in fact between the parties which, "although not embodied in an express contract, [was] inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances their tacit understanding" [8] with reference to storage of the armor plate. In

other words, the provisions of the contract, coupled with the acts and conduct of the parties, in our opinion, created a contract implied in fact between the parties for the storage of the property by the plaintiff for which it would be reasonably compensated by the government. This became increasingly clear as the years went by. Finally, in 1963, after plaintiff had stored and cared for the property for 10 years, the government apparently realized that the armor plate was not worth the accumulated storage charges and sought to relieve itself of this debt by unilaterally abandoning the property. We do not believe the government can escape liability for the storage charges in this manner. The contract plainly stated that when it had been completed the plaintiff would deliver the property to the government. Implicit in this arrangement was the obligation of the government to receive it and move it from the plaintiff's premises at the end of the contract. It could not divest itself of this obligation nor wipe out the storage charges after 10 years by announcing an abandonment of the property without the consent of the plaintiff.

We conclude that the plaintiff is entitled to recover reasonable storage charges for the period beginning six years prior to the filing of this suit on February 21, 1967, up to March 9, 1965, when the government offered to remove the armor plate from plaintiff's plant, but plaintiff would not allow its removal unless the storage charges were paid. The plaintiff is not entitled to charge storage after it refused to allow the defendant to remove the property. The plaintiff is not entitled to interest for the reasons discussed herein.

The defendant says the storage charges of plaintiff are exorbitant and could not be worth $100 per month. It may be that this is true, but we have no way of knowing what reasonable storage charges for this property would be, and,

---

8. Baltimore & Ohio RR v. United States, *supra*, 261 U.S. at 597, 43 S.Ct. 425, 67 L.Ed. 816.

accordingly, express no opinion regarding it. This will have to be determined in further proceedings.

■ The defendant also indicates that the plaintiff has not owned the factory since July 12, 1956, when an auction of certain of plaintiff's property was held. If this is true, the plaintiff would not be entitled to storage beyond the date of its ownership of the factory. However, there is no evidence in the record on this matter and the true facts will have to be shown in subsequent proceedings.

The government is entitled to set off, pursuant to 28 U.S.C. § 1503 (1964), the amount of $44,080 due the government from plaintiff by reason of the judgment recovered by the government against the plaintiff in the United States District Court for the Eastern District of Michigan, together with interest thereon, against any amount for which the government may be liable to the plaintiff.

■ The plaintiff has asked us to issue an order requiring the defendant to remove the armor plate from its plant. This court does not have jurisdiction of such a request, and is without authority to issue a mandatory order granting equitable relief of this kind. United States v. Jones, 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889).

The motion of plaintiff Algonac for partial summary judgment for storage charges of government-furnished armor plate in connection with the ninth contract is granted for the period from February 21, 1961, to March 9, 1965, without interest, subject to defendant's offset of $44,080 with legal interest thereon from October 15, 1958. This part of the case is remanded to the trial commissioner for a determination under Rule 131(c) (2) of this court of the amount of said plaintiff's recovery. The portion of said plaintiff's motion requesting the court to order defendant to remove the armor plate from said plaintiff's plant is denied; and plaintiff's request that the

decision of the Renegotiation Board be reversed is denied.

Defendant's motion for summary judgment as to the individual claims of plaintiff John A. Maxwell is granted and his petition is dismissed.

Defendant's motion for summary judgment that the decision of the ASBCA on the appeal of plaintiff Algonac Manufacturing Company involving the eight terminated contracts in ASBCA No. 1034 was neither arbitrary nor capricious, was supported by substantial evidence, was correct and should be affirmed, is granted and such decision is affirmed and said plaintiff's petition on this part of the case is dismissed.

Defendant's motion for summary judgment to the effect that it is entitled to offset the $44,080 judgment plus legal interest from October 15, 1958, which it has against plaintiff Algonac Manufacturing Company against any recovery herein by said plaintiff, is granted; and that portion of defendant's said motion that this court does not have jurisdiction of said plaintiff's request that we issue an order requiring defendant to remove *its armor plate from plaintiff's plant* is granted and that part of said plaintiff's petition is dismissed.

All other issues and contentions of the parties are hereby denied.