**L'ENFANT PLAZA PROPERTIES, INC.**

v.

**The UNITED STATES.**

No. 233–74.

United States Court of Claims.

March 11, 1981.

William Daniel Sullivan, Arlington, Va., for plaintiff; Warren K. Kaplan, Washington, D. C., attorney of record. Melrod, Redman & Gartlan, Washington, D. C., of counsel.

Alva P. Weaver, III, Baltimore, Md., for John McShain, Inc.

Randall B. Weill, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before DAVIS, Judge, SKELTON, Senior Judge, and SMITH, Judge.

## ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

L'Enfant Plaza Properties' claim arises under a 99-year lease by plaintiff's predecessor, as lessee, from the District of Columbia Redevelopment Land Agency (RLA), then an agency or instrumentality of the federal government,[1] as lessor. The contention is that, pursuant to this lease, defendant is liable for acts of trespass committed against the leased property by a third party, in the period after the lease was executed but before plaintiff was in full possession of the property. As grounds for RLA's liability, plaintiff relies on alleged express and implied warranties said to be created by the terms of the lease (and related agreements), as well as on acts of fraud, constructive fraud, and misrepresentation allegedly committed by RLA's agents. The case is now before us on cross-motions for summary judgment, one partial and the other full. Plaintiff raises solely the issues of pure warranty and promise.[2]

The Government, for its part, asks that we grant it full summary judgment and dismiss the entire petition, including the claims invoking fraud and misrepresentation. We deny plaintiff's motion for partial summary judgment, and grant defendant's motion for full judgment.

### I [3]

The underlying land was owned by RLA and formed part of the development now known as L'Enfant Plaza in the District of Columbia. Plaintiff's lease provided for the L'Enfant Plaza company's construction of a large combined hotel and office building, the "East Building" of the L'Enfant Plaza Complex. The necessary land was leased by RLA for a long period.[4] A primary purpose of the lease agreement was the redevelopment of the leased property in accordance with an urban renewal plan in effect for that section of the District of Columbia, including the leased property and adjoining areas. The lease was executed in November 1965, but did not call for plaintiff to take full possession of the property at that time. Instead, plaintiff came into complete possession in May 1971. See Lease § 104(a). In November 1965, plaintiff also entered into an Area Project Coordination Agreement with RLA, the General Services Administration (GSA), and other redevelopers, for the main purpose of coordinating construction schedules in the urban renewal area.

Between November 1965 and August 1969, GSA's contractor, John McShain, Inc., built what is now the Housing and Urban Development (HUD) Building, on property adjoining plaintiff's to the east. During the course of that construction, McShain

---

1. In *L'Enfant Plaza Properties, Inc. v. United States*, 209 Ct.Cl. 727 (1976), this court held, in this case, that, for the times relevant here, the RLA would be considered a federal entity the contracts of which may be vindicated in this court.

2. For its motion, plaintiff relies solely on its undiluted warranty and promise claims, and does not stand on its allegations of fraud and misrepresentation, about which, even on plaintiff's view, there are disputed issues of fact.

Defendant claims that these fraud and misrepresentation claims sound in tort and are outside our jurisdiction. *See* Part III, *infra*.

3. These are the undisputed facts relevant to the cross-motions for summary judgment.

4. The lease also gave plaintiff an option to purchase fee simple title to the land on or before the fifteenth anniversary of the completion of the East Building. Lease § 1001(b).

trespassed on the property involved here (under lease to plaintiff) by constructing a portion of the underground footings for the HUD Building on and near the edge of the leased property. In April 1971 RLA ·approved L'Enfant Properties' revised final plans for construction of the East Building. These plans were prepared by plaintiff in partial reliance on GSA and RLA plans showing the footings of the HUD building as abutting, but not encroaching, on the East Building property. In May 1971 plaintiff received from RLA a Certificate of Vesting of Possession, as provided in the lease. Shortly thereafter plaintiff's contractor began construction of the East Building.

This contractor quickly discovered that the footings of the HUD Building had been built on L'Enfant Plaza Properties' land. Those footings interfered with plaintiff's construction plans and caused it substantial damages and delays. Plaintiff sued McShain in the Superior Court for the District of Columbia and recovered part of its damages.[5] Full recovery was not available in that suit principally as a result of a partial bar of the statute of limitations. *See, L'Enfant Plaza East, Inc. v. John McShain, Inc.*, 359 A.2d 5 (D.C.C.A.1976). Plaintiff seeks to recover in this proceeding against the United States the damages not recovered from McShain in the earlier suit.

## II

We first consider plaintiff's claims for breach of the lease agreement, unmixed with its separate allegations of fraud and misrepresentation. This is the sole burden of plaintiff's motion for partial summary judgment (*see* note 2, *supra*) and we have already rejected (*see* note 1, *supra*) the only argument against our jurisdiction of that purely contractual claim which is founded on duties said to flow from alleged express and implied warranties and covenants of title, from the pre-fixed procedure for plaintiff's obtaining of full unconditional possession of the property (which did not occur until the spring of 1971), and from alleged promises in the lease as to the fitness of the leased property for the construction of the improvements.

For this part of the case we assume *arguendo*, without deciding, that the lease can be read to contain some such covenants, warranties, and promises.[6] But it is nevertheless true that all the lease's consensual undertakings are creatures of, and shaped and limited by, the complex of lease terms which delineate the duties and obligations of the parties. The lease agreement must be seen as a whole, in all its parts and against its background, to reach the answer to the decisive question: on which of the parties did the lease place the risk and burden of the particular third-party trespasses for which claimant now sues?[7]

It is not easy to resolve this problem; the lease is not precise, one way or the other, in describing the risks and obligations of the

---

**5.** The decision was affirmed on appeal in *John McShain, Inc. v. L'Enfant Plaza Properties, Inc.*, 402 A.2d 1222 (D.C.C.A.1979).

**6.** The Government seems to deny that there were any such warranties, covenants, or promises at all, but merely representations at most, and there has been much argument on these points. For the purpose of the present motions we assume, in general, the plaintiff's *characterization* of the portions of the lease agreement on which it relies—but not plaintiff's interpretation of the scope, breadth and coverage of those provisions.

We are also required to assume that RLA was wholly unaware of McShain's trespass. In its motion plaintiff has made no showing to the contrary and, indeed, assumes (for present purposes) RLA's total unawareness of McShain's

improper activity with respect to the footings of the HUD building. *See* note 2, *supra*.

**7.** The conventional rules on warranties and covenants of title, as well as the duty to place a tenant into unconditional possession of the leased property, recognize the primacy of the lease terms over the rules which could apply where "the lease is silent on the point." *See Keydata Corp. v. United States*, 205 Ct.Cl. 467, 480, 504 F.2d 1115, 1122 (1974). *Cf. Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 673, 428 F.2d 1241, 1255 (1970). There are, in addition, no statutory provisions which would preclude RLA from entering into a lease which imposed the risk and burden of a third-party's pre-vesting trespasses on the L'Enfant Plaza company's land.

parties with respect to this third-party trespass during the pre-building period. But there are certain lease provisions, and enough in the lease framework, to enable us to determine the limited issue before us.

First, the McShain trespass occurred, unknown to either party, during the period after the beginning of the lease but before the L'Enfant Plaza company received full possession of the land in 1971 and started to build. We do not believe that the company could (or was expected to) keep itself ignorant during that time of the things happening on the property it had formally leased in 1965 which could affect the construction of the large building plaintiff intended to build. On the contrary the natural understanding would be that the lease contemplated that plaintiff had both the right and the obligation to investigate the condition of the property in this 1965–1971 period. That was an important reason, in our view, why plaintiff was expressly granted full access to the leased property prior to full possession:

> Access to Leased Property Prior to Vesting of Possession. Prior to the date Possession of the Leased Property is Vested in the Redeveloper pursuant to this Agreement, the Agency [RLA] shall permit the Redeveloper access thereto whenever necessary to carry out the purposes of this Agreement; Provided, That the Redeveloper shall execute an appropriate "Save Harmless Agreement" with the Agency * * *. [Lease, § 202(f) (emphasis in original)].

In this specific situation—from the beginning there was expected to be a substantial period of time after plaintiff had leased the property for the very purpose of erecting the East Building but before it could actually start to build—the provision for full access appears to us to have contemplated that the company would concern itself with the matters which could interfere with its later erection of the building, and it could and would therefore investigate and inspect

conditions on the property during that time. It follows, we think, that the L'Enfant Plaza firm would itself bear the risk of McShain's hidden encroachments which could have been discovered by investigation and inspection but were not. Plaintiff's contention that the access provision was solely for its own option, whenever it chose to use it in its own full discretion—and that the provision has no other significance—disregards the natural expectation that a developer that leases property (to which it has access) on which it intends to build will try to make sure that the leased property is not misused to its detriment during the pre-building period. Whatever warranties and covenants on the part of RLA the lease may have contained did not cover these third-party encroachments on the property during the pre-vesting period, and did not protect plaintiff from its own failure (negligent or not) to discover those third-party interferences.[8]

There has been no showing that plaintiff was ever prevented from entering and inspecting the property pursuant to the access clause; in fact plaintiff did enter and exercise possession over part of the leased premises before the 1971 vesting date. That entry took place in May 1969, and was for the purpose of beginning partial construction of the East Building footings in order to facilitate the District of Columbia government's decision to place a temporary access road along part of the eastern side of the leased property. Although plaintiff's entry may have been limited in scope, in a different area, and at a different time than McShain's encroaching footings, it is still manifest that plaintiff had access to the property before the issuance of the Certificate of Vesting of Possession, and was more than just an uninvolved bystander prior to the 1971 vesting date. Under the lease, moreover, this District of Columbia temporary road cannot be said to have modified plaintiff's responsibility toward third-party

---

8. We repeat that none of the alleged warranties, covenants, and promises, explicit or implicit, deals specifically with the particular problem before us—and that each of them can

(and we think should) be read, in the light of other parts of the lease and of the arrangement's basic framework, as excluding the present situation.

encroachments on the leased property. The L'Enfant Plaza company voluntarily agreed to the placement of the temporary roadway through the leased property, and it has not shown that it could not have gotten permission to investigate the area around the road site, either from RLA or from the D.C. government. It had at least the same opportunity as RLA would have had to inspect and surveil the property during the pre-vesting period.

In addition, plaintiff knew of the construction of the adjoining HUD Building and probably had even more reason than RLA to check the leased site during the pre-building time. That was the area on which it was to erect the East Building. Upon discovery of the encroachment, plaintiff could have attempted to act on its own,[9] or at least could have informed RLA of the situation and requested it to act.

Nor do we have any reason to believe that, whatever opportunity or duty plaintiff had to inspect the property, RLA had a superior chance to learn of McShain's trespass. (The footings were underground.) Plaintiff does not allege RLA had actual notice of the encroachment, at least for purposes of this motion or of the non-tort claim we are now considering. *See* notes 2 and 6, *supra*, and Part III, *infra*. Instead, plaintiff argues that we should impute knowledge on RLA's part either because of its governmental status, or because of its duties under the Area Project Coordination Agreement (APCA). As for imputation of knowledge from one government agency to another, we stated in *Bateson-Stolte, Inc. v. United States*, 145 Ct.Cl. 387, 172 F.Supp. 454 (1959) and 158 Ct.Cl. 455, 305 F.2d 386 (1962), that

in a business so vast as that engaged in by the United States Government, with its multitudinous departments, bureaus, and independent agencies, with various and sundry projects scattered all over the world, it is impossible for one department to know what another department is go-

ing to do. In such case it seems unreasonable to charge one agency with knowledge of what another is going to do. [145 Ct.Cl. at 391–92, 172 F.Supp. at 457].

*See also, J. A. Jones Constr. Co. v. United States*, 182 Ct.Cl. 615, 625, 390 F.2d 886, 891–92 (1968). Here, we see no ground for charging RLA with constructive knowledge of the activities of GSA's contractor. RLA and GSA are independent entities and have no connection, outside of the fact that both agencies were involved with the urban renewal development of the L'Enfant Plaza complex. There is nothing to show that RLA was required to supervise or control the actions of GSA's contractor, or that it was responsible for plaintiff's reliance on the supposed accuracy of building plans submitted by GSA to RLA.

In particular, the Area Project Coordination Agreement and the lease provisions relating to it are not sufficient to create the kind of close relationship between GSA and RLA under which it would be appropriate to impute to the latter any knowledge which the former might have had of McShain's improper placement of the HUD Building footings. Under the Coordination Agreement and lease section 208(b), RLA's duties dealt primarily with coordinating construction schedules between redevelopers pursuant to a "critical path schedule" such that various phases of building were accomplished in an orderly, time-efficient manner. Neither the terms of section 208(b) nor of the Coordination Agreement made RLA responsible to one redeveloper for the quality of work being done by another. It would be incorrect to construe the Coordination Agreement as extending overall supervisory authority to RLA. Aside from the absence of any such provision, the Coordination Agreement was of limited duration and ended before construction was complete. In addition, the document specifically provided that the Coordination Agreement involved only "a pledge of best efforts to accomplish coordination of construction" and that it would not create any

---

**9.** While plaintiff argues that it would have had no rights as against a trespasser on the leased property prior to the vesting of possession in 1971, we are not convinced that this is a correct statement of applicable law. *See, e. g.* *D.C.Code* § 16–1101 et seq. (ejectment action).

legal liabilities or duties in the parties. *See,* ACPA ¶ 9. There is no ground, therefore, for finding in the papers agreed to by the parties any general authority in RLA over McShain, GSA, or the building of the HUD building.

L'Enfant Properties' own obligation to oversee the property and bear responsibility for it during the pre-building period was augmented by a lease condition that "[t]he Redeveloper shall not permit, commit, or suffer waste or impairment of the Leased Property, Air Rights, or the Improvements or any part thereof." Lease § 302. We agree with defendant that the most acceptable interpretation of this condition is that it was effective for the term of the lease (which pursuant to lease section 101 began in 1965) rather than just the time period after the 1971 vesting of full possession in plaintiff.[10] There is no doubt, of course, that McShain's actions resulted in waste and impairment.

The special authority and obligations created and recognized in plaintiff by these access and waste-or-impairment clauses limit or negate any explicit or implicit covenants to put L'Enfant Properties in full, unqualified possession of the leasehold upon the signing of the Certificate of Vesting of Possession in May 1971.[11] As we have said, such a covenant or promise is found only where and to the extent the lease does not otherwise deal with the subject. *See Keydata Corp., supra,* 205 Ct.Cl. at 480–81, 504 F.2d at 1122–23 (1974). Here, the lease speaks to our situation. The access and waste-or-impairment provisions (and possibly other lease terms) deal with the problem and limit any potential covenant or promise. Nor do the Certificate of Vesting, or section 104(a) of the lease (on vesting of

possession), create any right in plaintiff to unlimited absolute possession. Instead, section 104(a) clearly states that *"[e]xcept as otherwise provided in this Agreement,"* possession will vest in plaintiff a certain period of time after execution of the lease. (emphasis added). We interpret "[e]xcept as otherwise provided" to mean that where other lease terms qualify plaintiff's possessory rights, those qualifications will be reflected in the terms of the vesting. Thus, plaintiff obtained no more through the Certificate of Vesting than it already had as a result of the lease agreement itself. In addition, while the Certificate provides that the "site is prepared for construction of the improvements," immediately thereafter it states that "the Agency [RLA] hereby certifies that possession of the property *described in the lease* vested in the Redeveloper * * *." (emphasis added). This certainly occurred in the present case. We find therefore that neither section 104 of the lease nor the Certificate of Vesting of Possession overcomes plaintiff's obligations or its burden of risk under the lease-arrangement as a whole, and under the access and waste provisions in particular.

■ Accordingly, we conclude that under the lease plaintiff must bear the risk of trespasses by third parties such as McShain during the pre-vesting period. For this reason plaintiff's motion for partial summary judgment must be denied and the Government's cross-motion for summary judgment must be granted insofar as it relates to the indisputably contractual claim we have discussed in this Part.

### III

■ The Government argues, in its cross-motion for full summary judgment, that

---

**10.** There is no language limiting this clause to post-1971 waste or impairment, and since plaintiff had access to the property prior to 1971 through lease section 202(f), the access clause discussed *supra,* it had the means to carry out its duties under section 302 (the waste-or-impairment clause) throughout the full lease term.

**11.** Other provisions of the lease also lend some support to defendant's position that the parties agreed between themselves to divide up certain

other risks rather than to make RLA fully liable for all risks occurring before the 1971 vesting of possession. *See, e. g.,* Lease §§ 403 (indemnification for damages), 404 (reimbursement for legal expenses), 812 (excusable delays). Plaintiff says that these provisions are not applicable to the instant case, but whether or not this is so the existence of these provisions shows that the parties agreed to a sharing of various risks.

the whole case must be dismissed because the remaining claims (not dealt with in Part II, *supra*) sound in tort (fraud, misrepresentation, and constructive fraud) [12] and are therefore beyond this court's jurisdiction. *See* 28 U.S.C. § 1491; *Algonac Mfg. Co., supra,* 192 Ct.Cl. at 663, 428 F.2d at 1249 (1970). Plaintiff responds that the alleged fraud and misrepresentations are so closely bound up with the lease and the contractual relationship between RLA and L'Enfant Properties that they lie in contract rather than tort. *See, e. g., Fountain v. United States,* 192 Ct.Cl. 495, 498, 427 F.2d 759, 761 (1970), *cert. denied,* 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971); *Burtt v. United States,* 176 Ct.Cl. 310, 313–14 (1966). For this principle to apply, there must be a "tortious" breach of contract rather than a tort independent of the contract. *See Burtt, supra,* 176 Ct.Cl. at 314. Plaintiff has been unable to show a connection between the alleged wrongful misrepresentations and fraud and any contractual obligations owed to it by the RLA. It is not sufficient to argue, as plaintiff does, that the alleged tortious conduct is "related" in some general sense to the contractual relationship between the parties. We have already held in Part II, *supra,* that RLA was not responsible under the lease for McShain's trespasses, and plaintiff has not offered any other theory by which RLA *breached the lease* by failing through fraud and misrepresentation to warn plaintiff of those trespasses or to remove McShain's footings. We find, therefore, that no contractual claim exists with respect to the fraud and misrepresentation allegations, and the counts asserting those claims (Counts III and IV) must be dismissed.[13]

■ In certain circumstances, a case which is within the exclusive jurisdiction of the district courts but which is improperly filed in this court, may be transferred to a district court in which it could have been filed. 28 U.S.C. § 1506. This transfer stat-

ute is discretionary, however, and is available only when transfer is in the interest of justice. *Id.* We hold that transfer is not in the interest of justice although the district court has exclusive jurisdiction under the Federal Tort Claims Act. First, it has not been requested by either party, and second, it is unlikely that any purpose would be served by transferring those counts since there is little likelihood that they would succeed in the district court because of the bars of limitations and sovereign immunity. *See,* 28 U.S.C. § 2401(b) (two-year statute of limitations within which a tort claim must be filed with the appropriate federal agency) and 28 U.S.C. § 2680(h) (United States exempt from liability under Federal Tort Claims Act for claims arising out of misrepresentation or deceit). These claims accrued, at the latest, in the spring of 1971 when the trespass was discovered by plaintiff, *see L'Enfant Plaza, supra,* 359 A.2d at 7, and the present action was not filed until late June 1974. Nor do we have any indication that plaintiff filed a claim with the appropriate agency within the two year limitations period set by section 2401(b). It also seems very likely that plaintiff's tort claims would be barred by sovereign immunity since they relate to alleged acts of misrepresentation and deceit on the part of government employees—torts which are excluded from the Tort Claims Act. *See, McCreery v. United States,* 161 Ct.Cl. 484, 488–89 (1963) (refusal to transfer tort claim involving government misrepresentations because it would be barred by section 2680(h)).

For these reasons, plaintiff's motion for partial summary judgment is denied and defendant's motion for full summary judgment is granted. The petition is dismissed.

---

12. These claims are that RLA actually knew or should have known of McShain's improper activities but did not tell or inform plaintiff.

13. Since we hold for defendant on this ground, we need not reach the argument that these claims must also fail because they are the torts of an independent contractor of the Government for which the Government is not liable.