**REFORESTACION de SARAPIQUI,**
**Plaintiff**

v.

**The UNITED STATES, Defendant.**

**No. 516–89C.**

United States Claims Court.

April 29, 1992.

---

Elizabeth K. Ainslie, Philadelphia, Pa., attorney of record, for plaintiff.

James W. Poirier, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

### REGINALD W. GIBSON, Judge:

*Introduction*

Plaintiff[1] filed a complaint against the Overseas Private Investment Corporation (OPIC),[2] a United States Government agency, under a perceived breach of contract theory. A thorough analysis of plaintiff's argument, however, demonstrates that the substance of its claim is essentially one for misrepresentation, *i.e.*, a tort, against the government. In opposition thereto, on January 2, 1991, there was filed Defendant's Motion To Dismiss, Or In The Alternative, For Summary Judgment. Because of the strict jurisdictional requirements of this court, which precludes claims in tort against the United States, we dismiss plaintiff's complaint.

*Facts*

In 1984, OPIC loaned $375,000 to a certain commercial enterprise in Costa Rica interested in establishing a timbering operation, *i.e.*, making axe and wheelbarrow handles and other items from local timber. This project was owned by Maderas Tropicales San Carlos, S.A., a Costa Rican corporation, whose equity owners included several United States citizens. As a result of apparent problems with the proposed venture in 1986, OPIC demanded that additional security for the loan be provided by Maderas Tropicales, and in response, John Hull (Hull), a United States shareholder in said corporation, granted the government agency a lien on several tracts of undeveloped land in Costa Rica.[3] Following there-

1. Plaintiff, Reforestacion de Sarapiqui (Reforestacion), is a corporation formed and operating under the laws of Costa Rica. Its president during all pertinent times herein was one David Dickstein, *infra.*

2. OPIC is an agency of the United States. It was created to assist American business enterprises in investing in developing countries by providing loans and political risk insurance.

3. The lien granted by John Hull described the property as "property in Harquetas, District Three, Sarapiqui, Canton Teu, Province of Heredia, and by reference to the three Folio Real numbers (96,137–000, 105,244–000, and 96,193–000) 'with metes and bounds as indicated in the Registry.'" Jt.Stip. ¶ 3.

In addition, Hull represented to OPIC that the total value of the property was $544,443.53—this included a land value of $192,723.37 and a timber value of $351,720.16. *Id.* ¶ 4. However, OPIC did not disclose these figures to the plaintiff, and plaintiff did not receive notice of this representation until after this litigation began, when counsel for the plaintiff acquired a copy through the Freedom of Information Act. *Id.*

Also, on September 21, 1987, a letter was sent to John Hull in Costa Rica from OPIC (Thomas B. Clegg, Acting Treasurer), Pltf's App. at 168a, which informed Hull that OPIC had been visited by representatives of conservation organizations who indicated that the property near the national park was environmentally sensitive and that the organizations wanted to protect it. Specifically, the letter went on to say that:

> ... OPIC understands that you will have to take this environmental issue into account in making any decisions about possible uses for the land. We will suggest that the environmental groups deal with you directly so that you will have an opportunity to work out an arrangement for them to buy the land or trade it for other land in the United States of equal value. Please keep in mind, however, that donating the land would do nothing to reduce your debt. If, however, an acceptable sale price, or substitution of other property acceptable to OPIC as collateral can be arranged, OPIC would be willing to release its mortgage to facilitate such a transaction. Of course, any shortfall between the amount of the debt and the price realized on the sale of the property (or property obtained in a trade) would still have to be made up by you because OPIC's debt is due in full.

> I strongly encourage you to develop a realistic plan for liquidating your obligation to OPIC as soon as possible. It appears that the conservation organizations could be an integral part of such a plan. I am scheduling a visit to Costa Rica in the near future and will discuss with you how this matter can be resolved. In the meantime, OPIC has no option but to allow the Justice Department to proceed.

*Id.* The foregoing was also unknown to the plaintiff until sometime *after* the suit was initiated. PMSJ at 6.

on, Maderas Tropicales defaulted on its loan from OPIC, and OPIC initiated steps to acquire said mortgaged property. Prior to commencing foreclosure proceedings in May of 1988, however, OPIC, through its Deputy Treasurer and then Managing Director for Special Assets, Thomas Clegg (Clegg), placed an advertisement in *The Wall Street Journal* in March of 1988 in an attempt to sell the defaulted mortgaged property. The advertisement read as follows:

> FOREST PRODUCTS/COSTA RICAN TIMBERLAND: 17,000 acres of prime Costa Rican timberland for sale or lease. Estimated value of timber is $3,500,000. Base price US $550,000. CONTACT: HUMBERTO PACHECO/BUFFETE PACHECO COTO/San Jose, Costa Rica (506) 22-14-96.

*Id.* Mr. Humberto Pacheco (Pacheco) was OPIC's Costa Rican attorney.[4]

The estimated timber value ($3.5 million) was obtained through information supplied by Mr. Ernesto Wang Wong (Wang), an individual associated with the timber business in San Jose, and supplemental sources indicating the potential market and price for the timber. A base price of $550,000 was listed for the land because "that was the approximate value of the outstanding principle amount plus accrued interest of OPIC's loan to Maderas."[5]

Mr. David Dickstein, an experienced real estate developer from Philadelphia, Pennsylvania, read the advertisement and subsequently telephoned Mr. Pacheco (Pacheco) to inquire about the property.[6] On behalf of himself and his partner, David Wallach (Wallach), an investment banker also from Philadelphia, Dickstein was interested in investing in a timbering business in Central America. However, neither Wallach nor Dickstein had any prior experience in operating a timber enterprise and both lacked any type of business involvement in Latin America. Notwithstanding the foregoing, Dickstein thereafter organized a visit to Costa Rica for April 16–18, 1988.

Upon Mr. Dickstein's arrival in San Jose on April 16, 1988, Mr. Pacheco introduced him to Wang when Dickstein inquired about visiting the advertised property, *supra*. Wang, an expert in the Costa Rican timber industry, agreed to lead Dickstein to the advertised land, since Pacheco himself did not know the location.[7] Actually, Dickstein testified that Orfilio Chaves (Chaves), the owner of the property prior to Hull, physically led the expedition.[8] Pacheco also arranged for a local surveyor, Alfredo Betancourt (Betancourt), to join the group visiting the property. A day-long visit to the property that was represented to be the subject of *The Wall Street Journal* advertisement ensued thereafter on April 16, 1988.[9] The expedition consisted of several

---

4. With regard to the sale of this property, Mr. Pacheco had only a limited power of attorney from OPIC "to effect the assignment or the sale to the individual or legal entity at the price and terms of payment which [OPIC] shall indicate in due course by telex." DMD at 4, n. 3; and Pacheco's Declaration dated February 1, 1991.

5. Approximately six months before the advertisement was placed in *The Wall Street Journal,* representatives of OPIC were attending hearings before the Subcommittee on Terrorism, Narcotics and International Communications. At these hearings, John Hull's former partner, William Crone, testified "that he knew of only two farms owned by Hull and that together those farms were not worth $375,000. [The precise relationship, if any, between these farms and the property at issue here is not clear]." Jt.Stip. at para. 7. Crone also stated that Mr. Hull had been attempting for one year to receive a permit to cut timber off the property, and that "without the timber, the farm had 'no value.'"

6. At some time *prior* to visiting Costa Rica, a typographical error was discovered in the advertisement during telephonic conversations between Pacheco and Dickstein. Actually, the offered property consisted of 1,700 acres, not 17,000 acres. After learning of this mistake, Dickstein nevertheless indicated his continued interest in visiting the property. Jt.Stip. ¶ 16; and Pacheco's Declaration, paras. 5 and 7.

7. Pacheco told Dickstein that he did not know Wang well. Jt.Stip. ¶ 15.

8. Although Chaves physically led the expedition, he was considered "one of Wang's people" for purposes of the journey.

9. Wang also had an interest in purchasing the advertised land. However, OPIC wished to locate an American investor. Jt.Stip. at para. 21. Because Pacheco knew of Wang's interest, and because he needed Wang to locate the land, he suggested to Dickstein that he should not reveal

181

hours of driving and hiking through jungle terrain to a heavily forested district of Costa Rica. When the entourage located the land covered by the advertisement, Wang brought to the attention of Dickstein caobillo and other trees he stated as commercially viable.[10] Jt.Stip. ¶ 23.

When the party returned to San Jose later that day following the site visit, Dickstein proposed to Wang that they enter into a business arrangement to harvest and sell the available timber on the land. Wang subsequently agreed to contribute his time and expertise in timber operations, and Dickstein and his associate Wallach agreed to contribute the necessary financing, negotiating posture, and organizational skills. *Id.* ¶ 25, 26. During the following two or three days after his return to San Jose, Dickstein initiated arrangements to conduct the timbering business. He contacted a potential purchaser of the timber, visited Wang's sawmill, and spoke with individuals who had conducted business with Wang so as to make a determination regarding Wang's reputation and capabilities.

On the second day of his visit, April 17, 1988, Dickstein and Wang also visited Pacheco's office to inform him of the proposed business arrangement to which Pacheco approved. While in Pacheco's office, Dickstein claims that he viewed actual plot plans of the land he was considering purchasing, because the plot plans contained matriculation numbers which were identical

to the numbers described in the subsequently executed mortgage document.[11] In addition, on the second day of his inspection trip, April 17, 1988, Dickstein traveled with Wang to the Costa Rican Forestry Department to look at forestry records of timber on the property which were previously prepared with the assistance of the United States Agency for International Development. Through utilization of this data, Dickstein estimated the expense of logging the timber and anticipated income from the sale thereof. In addition, he calculated a resulting anticipated profit of $1,950,000 over five years of timber operation. While at the Forestry Department, Dickstein also explored the requirements for obtaining a logging permit. At that time, he was not informed that logging permits could not be issued for the property. Following the foregoing investigations, Dickstein initiated negotiations on April 18, 1988, by a letter of intent with Mr. Clegg, in Washington, D.C., for the acquisition of the advertised land. Said letter was forwarded from San Jose to Mr. Clegg explaining his plans.

On May 9, 1988, four documents in Spanish evidencing the agreement and business arrangements were executed in Washington, D.C.[12] One of these documents, the sales agreement, provided that OPIC would transfer three properties to the plaintiff through a sale to be held in a San Jose court in May 1988 following the foreclosure

his own interest in the land to Wang, out of fear that Wang would refuse to lead the expedition. DMD at 6–7, n. 6. Deft's App. at 33–34, 137, 240.

**10.** Dickstein was not provided with any plot plans identifying the land during this first day. *Id.* ¶ 24. However, during the trip, Pacheco notified Dickstein that he should have a plot plan of the proposed property drafted. *Id.* ¶ 28. In response, Wang told Dickstein that he knew of such plans already in existence that he would show Dickstein when they returned to San Jose. *Id.* ¶ 28.

**11.** However, Dickstein admitted that he never looked at the Royal Folio, which is the official registry for property in Costa Rica. Pltf's App. at 61a. In addition, Dickstein never consulted an attorney in Costa Rica. He claims that he believed Pacheco, OPIC's attorney, was "in effect," also acting as his attorney. Although he

stated that he had never before relied upon an attorney who was advising another party, he believed it was proper in this case because he was dealing with an agency of the United States. Deft's App. at 150–51.

**12.** The property was purchased in the name of Gatesone Corporation, which was later renamed Reforestacion de Sarapiqui. Deft's App. at 125–26. The original structure of the corporation allowed Wang to own 60% of the outstanding shares, Dickstein to own 20%, and Wallach to own 20%. Deft's App. at 210. Subsequently, the corporation was restructured when Wallach transferred his entire interest to Dickstein, and Wang transferred an amount so that he was left with less than 1% stock ownership. Therefore, Dickstein currently owns more than 99% of the corporation. *Id.* at 225. Jt. Stip. ¶ 35–37. Official English translations were subsequently drafted.

on the Hull mortgage. Consistent therewith, in May 1988, at the foreclosure, OPIC did acquire title to the Hull properties through a foreclosure bidding process, and subsequently transferred title of said properties to plaintiff. Jt.Stip. ¶ 40–44. In exchange for the property, the agreement allowed plaintiff to meet its obligation in either of two methods. First, plaintiff possessed the option to make three annual payments of $150,000 to OPIC and a final payment of $100,000. Second, plaintiff alternatively could choose to pay OPIC 15% of its annual gross revenue from the proposed timber operation, with a minimum $50,000 payment each year and a maximum total payment of $550,000. Nevertheless, interest would accrue in either case at 7.5% annually.[13] *Id.* ¶ 40.

The sales agreement also described the three properties by reference to their recordation in "the Public Register of Costa Rica, in the Royal Folio of the Province of Heredia, identified under matriculation [numbers 96,137–000, 96,193–000 and 150,-244–000], having location, description, boundaries and measurements indicated in the register." Jt.Stip. ¶ 41, Exh. D at 7a. The mortgage document, however, notes that a mortgage on the properties is recorded in "the Property Register, in the Royal Folio of the Province of Heredia," identified under matriculation numbers 96,-137–000, 96,193–000 and 105,244–000. *Id.* at 16a. The parties stipulate, however, that one of the documents contains a typographical error with respect to the third property. Jt.Stip. ¶ 42.

The mortgage also describes the properties by type of land, boundaries, and measurements. For example, no. 96,137–000 is described as:

composed of grazing land with scrub grass located in District Three, Canton Teu in the Province of Heredia: Boundaries: north, Jose Orfilio Arrieta Zamora; south, Guillermo Arrieta Zamora; east Manuel Barrantes Kiewit; and west, Rio Guacimo. Measurements: two hundred eighty-four, eighty-four acres, sixty-nine square meters.

*Id.* No. 96,193–000 is described as:

composed of land with a house, scrub grass and more, located in District Three, Canton Teu in the Province of Heredia: Boundaries: north, Gerado Arrieta Zamora; south, Rafael Arrieta Zamora; east, Orfilio Araya Chaves; and west, Rio Guacimo. Measurements: two hundred sixty-eight hectares, forty-seven acres, forty-one square meters, fifty square decimeters.

*Id.* No. 105,244–000 is described as:

composed of land with two ranches, grazing land, mountains and orchards, located in District Three, Canton Teu in the Province of Heredia: Boundaries: north, Orfilio Araya Chaves; south, Guillermo Araya Blanco; east, Adiljia Chacon Quiros; and west, Rio Guacimo. Measurements: two hundred fifty hectares, forty-five acres, fifty-one square meters and eighteen square decimeters, to secure the sum of five hundred fifty thousand dollars U.S. currency.[14]

*Id.* at 16a–16b. Finally, the mortgage document establishes the sale price to be $550,000. *Id.* at 17a.

During the months following the execution of the foregoing agreement, Dickstein and Wang apparently began working to establish their timbering operation. Dickstein stated that Wang possessed responsibility for obtaining the necessary logging permit, and that research was done and a proposal drafted and submitted to the Forestry Department in an effort to meet the guidelines for acquiring the permit. When Wang submitted his proposal for the per-

---

**13.** Plaintiff has made no payments to OPIC as of this date. *Id.* ¶ 41.

**14.** With respect to the stated measurements, it should be noted that no. 96,137–000 is slightly larger than 284 hectares, no. 96,193–000 is slightly larger than 286 hectares, and no. 105,-244–000 is slightly larger than 250 hectares. *Webster's New Collegiate Dictionary* 724 (1977)

states that one hectare is the equivalent of 2.471 acres. Therefore:

| | | |
|---|---|---|
| 284 (2.471) | = | 701.764 acres |
| 286 (2.471) | = | 706.707 acres |
| 250 (2.471) | = | 617.750 acres |
| Total 820 | | 2,031.220 acres. |

As a result, the size of the described land is slightly more than 2,000 acres, not 1,700 acres.

mit, however, he submitted the plot plans which Dickstein stated he first viewed in Pacheco's office. The application for the logging permit was rejected by the Forestry Department, and a memorandum dated April 5, 1989, from the Forestry official who conducted the investigation stated that his findings "confirmed that said properties are incorrectly located." In addition to the incorrect location of the properties as determined by the plot plans, the report addressed other inadequacies in the management plan which led to the rejection of the permit.

When Wang notified Dickstein of the trouble he encountered in attempting to acquire the necessary timbering permits, Dickstein investigated the matter on a subsequent visit to Costa Rica. According to Dickstein, he had a conversation with an official at the Forestry Department who informed him that in "no way would [he] ever obtain a permit." Pltf's App. at 52a–53a. Specifically, Dickstein stated that he was advised that:

> ... permits for timbering in Costa Rica were in general extremely difficult to get because of their well-known long established conservation efforts and in this particular region, it would be impossible to get it because this was a region that had been targeted for the retention of natural animals and plants and indeed borders the large national forest, that said border being the Rio Guacimo.

*Id.* at 53a. Following further investigation, Dickstein contends that he actually

discovered that the land identified by the plot plans was owned by other people. *Id.* at 55a–56a.

When Dickstein raised this allegation with OPIC, OPIC, on May 22, 1989, sent a letter to Mr. Betancourt, a Costa Rican surveyor, requesting him to investigate the alleged problem. According to the report prepared subsequent to his investigation, Betancourt observed that the properties as described in the Costa Rican Public Registry and the sales agreement actually lie north of the area where the plot plans locate them. Deft's App. at 74. In addition, Betancourt's report of June 20, 1989, states that:

> After conducting a field visit, I have established that the boundaries of the properties do not coincide with the boundaries on the Catastro plans. It is important to note that it is very probable that the total area of the properties is much smaller than the assigned area detailed on the Catastro plans. In talking with some of the neighbors, I was informed that the properties [as stated in the Public Registry] were previously owned by John Hull.

It appears from the foregoing that the information in the plot plans shows land in a different location than that described in the Registry, and that the plot plans describe property actually owned by other individuals.[15]

In view of the foregoing factual history, on September 20, 1989, plaintiff filed a

---

**15.** The discrepancy between the plot plans, the Catastro plans, and the Registry was addressed by Pacheco:

> 15. The plot plans tendered by Mr. Dickstein during this litigation indicate "para titular". This means that these plot plans were to be used to record the property into the land Registry initially. This process would involve taking a plot plan such as this to the registry of Catastro where, if it meets certain engineering requirements, it is stamped and entered into the Catastro. The Catastro is a registry of plot plans which is separate from, and inferior to, the land Registry. Thereafter, the plot plan is presented to either a court or a public land institution and, if everything is in order, the property is identified with the owner and recorded in the land Registry. Hence, any plot plan which states that it is "para

titular" must antedate the time in which the property was registered in the land Registry.

> 16. In addition, the plot plans presented by Mr. Dickstein are dated 1976. They contain, however, in the right-hand corners, numbers (*e.g.,* 96,193–000) which are from a computer system introduced into the Costa Rican property registration system only a few years ago. Therefore, those numbers must have been added to the plot plans at some date later than 1976. These plot plans do not, however, contain tomo and folio numbers (see lower right hand corners). If these plot plans were reflective of property that was registered in the land Registry in 1976, as they indicate was their purpose, they would contain entries from the registration system which predated the computer system. That is, they should indicate the tomo and folio numbers of that property in the land Registry.

claim for breach of contract in this court pursuant to 28 U.S.C. § 1491. Inasmuch as plaintiff's complaint is not a model of clarity regarding its substantive allegations, we again note that its *essential grounds* were detailed as follows:

"... In reliance on the representations of OPIC representatives, Dickstein and Reforestacion expended substantial amounts of money, time and effort to obtain licenses to extract the timber in question and to set up a logging operation.

... In fact OPIC did not own the parcels of land it purported to convey to Dickstein and his corporation. Moreover, because of restrictions placed on the land by the government of Costa Rica, logging is not generally permitted on *either* the parcel of land that OPIC apparently intended to convey nor the parcels of land that it purported to convey.

... Because of OPIC's breach of its contractual obligations, plaintiff has been damaged in the approximate amount of $1,950,000.

WHEREFORE, plaintiff demands judgment against defendant for compensatory damages, interest, costs and reasonable attorneys fees."

Complaint at 3–4 (emphasis added).

Defendant, in response, filed an answer and counterclaim on December 4, 1989, also asserting the affirmative defense that plaintiff's claim is barred by the doctrine of estoppel. In its counterclaim, defendant avers that it transferred to plaintiff property in exchange for a promissory note in the principal sum of $550,000; that the entire amount of the note remains unpaid; and that interest in the amount of $56,604.17 has accrued and also remains unpaid. Specifically, it prays—

... that the Court enter judgment in favor of defendant in the amount of $56,-604.17, plus interest as provided by law, that the complaint be dismissed, and that defendant be granted such other and further relief as this Court may deem just and proper.

Answer at 4–5.

On December 18, 1989, plaintiff filed an answer to defendant's counterclaim raising the following five affirmative defenses:

FIRST AFFIRMATIVE DEFENSE

The contract referred to in defendant's counterclaim is void for lack of consideration.

SECOND AFFIRMATIVE DEFENSE

The contract relied upon by defendant in its counterclaim is void for failure of consideration.

THIRD AFFIRMATIVE DEFENSE

The contract relied upon by defendant in its counterclaim is void for mutual mistake.

17. Because these plot plans state "para titular", indicating that they do not refer to property already registered but to land which is being proposed for registration, and because these plot plans do not reflect the proper entries from the land registration system in place at the time they are dated, I would advise a client not to rely upon them. Instead, I would advise a client to have the property surveyed to be assured of its size and location before entering into any business transaction involving the property. In fact, I several times advised Mr. Dickstein to have this property surveyed, even though he was not my client.

18. My authority concerning this transaction was proscribed by a Power of Attorney from OPIC executed on February 18, 1988, a true copy of which is attached to this declaration. That document provided that I may "proceed to assign the rights as regards the mortgage foreclosure proceedings heard at the Second Civil Court of San Jose filed by the principal against Maderas Tropicales San Carols, S.A., and others under case file No. 1193.-87, or to sell the rural properties recorded in the Public Registry on [the royal folio] of the Province of Alajuela and under registration No. 175,521.000 and registration Nos. 96,137.-000, 96,193.000 and 105,244.000, [the last three of the royal folio] of the Province of Heredia, and in every case to effect the assignment or the sale to the individual or legal entity at the price and terms of payment which the principal shall indicate in due course by telex." I had no authority to negotiate on behalf of OPIC for the sale of this property or to represent this property in any manner other than that recorded in the Public Registry under the indicated registration numbers. Further, I made no representations concerning this property in any manner inconsistent with the information recorded in the Public Registry under the indicated registration numbers.

Pacheco Declaration.

FOURTH AFFIRMATIVE DEFENSE

The contract relied upon by defendant in its counterclaim is void because of *fraud* at the inception.

FIFTH AFFIRMATIVE DEFENSE

Defendant has waived the interest payments herein demanded. Plaintiff's Answer at 1–2 (emphasis added).

This opinion, against the foregoing background, addresses the defendant's motion to dismiss and, if appropriate, the parties' alternative cross-motions for summary judgment, seriatim.

*Contentions*

1. Defendant

With respect to its motion to dismiss, defendant has asserted two arguments. First, it contends that plaintiff's claim is essentially one for misrepresentation and not breach of contract. Therefore, defendant argues that since a claim of misrepresentation is one sounding in tort, this court lacks subject matter jurisdiction to entertain the claim under the Tucker Act. Specifically, defendant contends that to the extent Reforestacion argues that OPIC did not properly represent the value, location, size, and nature of the property, this is clearly the type of claim which sounds in tort. Secondly, defendant argues that plaintiff has failed to state a claim pursuant to RUSCC 12(b)(1). In this connection, defendant contends that the only damages which plaintiff alleges has been *anticipated profits* from the contemplated timbering operation and that such profits are *not* recoverable in the United States Claims Court.

With respect to its alternative motion for summary judgment, defendant sets forth three arguments. First, defendant contends that the terms and provisions in the sales agreement and mortgage are indisputably clear in delineating defendant's limited obligations. In other words, defendant argues that it "is apparent from these documents that OPIC's sole [legal] obligation was to transfer to plaintiff *the* three properties, *as described in the Public Registry,* which it was to acquire from Maderas Tropicales [and that] OPIC has done

just that." (emphasis added). Moreover, defendant contends that this court "may not consider extrinsic evidence which would contradict the terms of the written agreement." *Id.*

Secondly, defendant argues that it consistently communicated to the plaintiff throughout the negotiations that its knowledge and commitments concerning the property were limited. For example, defendant asserts that it repeatedly advised Dickstein to consult a lawyer and have the property surveyed. Additionally, defendant argues that clear evidence of its lack of knowledge became evident when Pacheco, OPIC's Costa Rican attorney, asked Wang to take Dickstein to the property at issue.

Defendant's third and final contention with regard to its motion for summary judgment is that "Reforestacion may not supplement the parties' written agreement to include a warranty by OPIC as to the value of the property." In support of its contention, defendant offers the hypothesis that otherwise—"every homeowner who advertises his property for sale may be subject to suit because he advertised it at a price which may be greater than the current fair market value [and that clearly], the buyer must be responsible for making its own determination of the value of the property, along with his decision as to the price he is willing to pay." This makes good sense inasmuch as the universal definition of market value is that price a willing buyer will pay and a willing seller will accept. In fact, defendant contends that Dickstein actually "undertook his own exploration of the likely value of this property ... [and actually] consulted the same local timbering expert [Wang] upon whom OPIC had relied in reaching its estimate for its advertisement in the *Wall Street Journal....*" *Id.* at 20–21. Defendant also asserts that it made no commitment concerning the *exact* location of the property and that "[t]he only representation as to the geographic location of the property made by OPIC was to refer to the description in the Public Registry." *Id.* at 22.

In addition, defendant argues that it is entitled to judgment on its counterclaim. This is so, defendant asserts, since the mortgage agreement provides that should plaintiff "fail to make any payments of principal or interest in a timely manner, 'OPIC may declare the term ended and call in the entire amount outstanding, including accrued interest.'" Since plaintiff has not disputed, but has conceded, that it has *not* made the requisite payments due under the agreement, then defendant is entitled to judgment "in the amount of $550,000 plus interest." *Id.* at 27.

## 2. Plaintiff

With respect to defendant's argument that the complaint should be dismissed because it sounds in tort, plaintiff contends that although the facts at bar "support a claim of negligent and even intentional misrepresentation," this case deals with the tortious breach of a contract which clearly falls within the jurisdiction of the Claims Court. In addition, plaintiff argues that anticipated profits have on occasion been recoverable in this court and that dismissal on the pleadings for failure to state a cause of action would be inappropriate at this stage of the proceedings.

With respect to its cross-motion, plaintiff sets forth two contentions. First, plaintiff argues that the contract "called for defendant to deliver to plaintiff approximately 1,700 acres of prime Costa Rican timberland, containing timber with an estimated value of $3,500,000 and [that] defendant breached this agreement." Specifically, plaintiff argues that based on the representations as to size and value averred by the defendant prior to the contract, "it is clear that the parties did not intend that the agreement be limited to the numbers in the Costa Rican registry recited in the written documents [but that] it also encompassed all the descriptions that defendant gave of the property: [*i.e.,*] the description of the

property [detailed] in the *Wall Street Journal* and reinforced by OPIC's Thomas Clegg ... as well as the plot plans furnished to Dickstein by Wang." [16]

Plaintiff's second contention is that it clearly did not bargain for *the Hull properties*, but that "it bargained for valuable timberland ... in accordance with defendant's published and reiterated representations ... and it clearly [did not receive what it bargained for]." Accordingly, plaintiff argues that it is entitled to be put in the position it would have been in if the defendant had not breached its contract and is therefore entitled to recover its anticipated profits.

Finally, in response to defendant's argument on its counterclaim, plaintiff contends that since defendant "cannot show that it conveyed to the plaintiff prime Costa Rican timberland, containing timber with an estimated value of $3,500,000," defendant cannot be entitled to $550,000 plus interest.

*Issues*

There are three essential issues which this court must consider. The first is—whether plaintiff has established the requirements of an implied-in-fact or an oral contract, which defendant subsequently breached.[17] The second issue is—whether the substance of plaintiff's claim is actually one of misrepresentation, *i.e.*, an action sounding in tort, and not arising out of a contract, thereby removing the complaint from the jurisdiction of this court. Finally, the third issue is—whether, assuming the plaintiff's complaint is not dismissed for lack of subject matter jurisdiction, there are any genuine issues of material fact which would prevent this court from granting either of the alternative cross-motions for summary judgment.

*Discussion*

## 1. Motion to Dismiss

■ The essential contention proffered by defendant with respect to its motion to

---

**16.** During oral argument on subject motion, counsel for plaintiff averred that—"It is my belief that the contract that was formed between the parties is not limited to those four Spanish documents, but rather is formed out of the course of conduct between the parties."

**17.** Plaintiff's counsel concedes that there was no breach of the *written contract* and avers that the breach complained of relates to a "contract that was formed between the parties ... out of the course of conduct...." Tr. 35–40.

dismiss is that the Claims Court lacks subject matter jurisdiction to entertain the plaintiff's claim because it clearly sounds in tort. When reviewing a motion to dismiss pursuant to RUSCC 12(b), the court will normally consider the facts alleged in the complaint to be true and correct for purposes of the motion. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). On the other hand, "if a motion to dismiss for lack of subject matter jurisdiction ... challenges the truth of the jurisdictional facts alleged in the complaint, the ... court *may* consider relevant evidence in order to resolve the factual dispute." *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir. 1988) (emphasis added and citations omitted) (the court noted here that because the plaintiff's amended complaint alleged that she served pursuant to a contract, this allegation, left unchallenged, would be sufficient to support Tucker Act jurisdiction).

## 2. Jurisdiction—Plaintiff's Contract Claim

■ With respect to ruling on such a motion, it is a well-grounded proposition that the United States Claims Court is a court of special, and therefore, limited jurisdiction. *American Maritime Trans., Inc. v. United States*, 870 F.2d 1559, 1563 (Fed.Cir.1989). Accordingly, congressional consent to suit in the Claims Court, "thereby waiving the Government's traditional immunity, must be explicit and strictly construed." *Puget Sound Power & Light Co. v. United States*, 23 Cl.Ct. 46, 56 (1991), *citing Library of Congress v. Shaw*, 478 U.S. 310, 318–19, 106 S.Ct. 2957, 2963–64, 92 L.Ed.2d 250 (1986).

The provision granting consent to suit in this court is, of course, the Tucker Act, 28 U.S.C. § 1491. Specifically, said statute provides that an action may be maintained in the Claims Court *only* if it is:

... founded either upon the Constitution or any Act of Congress or any regulation of an executive department, *or upon any express or implied contract* with the United States, or for liquidated or unliquidated damages in cases *not sounding in tort.*

28 U.S.C. § 1491 (emphasis added).

Therefore, it is undeniably clear that the party who files a complaint in this court must succinctly and unambiguously satisfy the jurisdictional requisites of the Tucker Act. Plaintiff, at bar, is attempting, of course, to satisfy the minimum jurisdictional requirements through a contract claim. In order to meet its requisite jurisdictional burden, with respect to a contract claim, plaintiff must first prove the existence of *either* an express written contract *or* an implied-in-fact contract. In addition, once the existence of either is proven, plaintiff must then show that there was a duty imposed and a breach of a provision of that contract, which resulted in damages for such breach. Plaintiff may not, however, disguise or mask a substantive claim in tort as one in contract in order to attempt to secure Claims Court jurisdiction. Accordingly, we must succinctly examine the authentic nature of plaintiff's claim to determine whether it is truly contractual or tortious.

In its complaint, plaintiff's alleged jurisdictional facts necessary for a contract claim were extremely vague and ambiguous. Therefore, in response, defendant challenged plaintiff's contract claim and averred that the essence of the claim was misrepresentation, a tort for which this court has no jurisdiction. Accordingly, we held oral argument on the pending motions in order to clarify and determine the precise nature of plaintiff's claim. For example, it was critical to ascertain whether plaintiff was alleging a breach of *the* written sales agreement and mortgage contract executed by the parties in May 1988, or whether plaintiff was averring a duty and the breach of a *separate* contract entered into by the parties which will provide the relief prayed for. As noted under *Reynolds*, when addressing a motion to dismiss for lack of subject matter jurisdiction, it is well within the power of this court to consider relevant facts or other evidence to resolve factual disputes, including the ability to hold oral evidentiary hearings.

### a. *Written Sales Agreement and Mortgage*

■ On or about May 11, 1988, both parties executed a written sales agreement and Mortgage outlining the terms of the transaction. These agreements essentially provided that defendant would purchase, at a foreclosure, the properties owned by Hull and mortgaged to OPIC, as described in the Public Registry of Costa Rica in the Royal Folio (Royal Folio) # 96,137–000, 96,-193–000, and 105,244–000, and subsequently transfer such identified property to plaintiff for a price of $550,000. There were no written provisions contained *within* these agreements adjectivally characterizing the quality or the nature of the timber on the land to be sold or to the value of the timber being $3,500,000. All that they contained, in substance, was a sterile representation that OPIC was selling and transferring unto plaintiff the foregoing three properties identified, *supra*, obtained as the result of the mortgage foreclosure filed against Maderas Tropicales San Carlos, for a stipulated consideration.

After careful review of the contract terms, we find that defendant has performed all its duties described therein for three reasons and there was no breach thereof. First, defendant successfully purchased the subject property at the foreclosure sale. Secondly, defendant transferred said land, which is *described* in the Public Registry of Costa Rica (Royal Folio # 96,137–000, # 96,193–000, and # 105,244–000) and previously owned by Hull, to the plaintiff. Thirdly, plaintiff paid the described purchased price of $550,000. Moreover, at oral argument on subject motion, plaintiff's counsel made the following judicial admissions in response to the court's questions:

> Ms. Ainslie: ... But the claim that we have made is clearly that there was a contract between the government and the plaintiff whereby ... OPIC purported to agree with plaintiff that it would sale [sic] the plaintiff prime Costa Rican timberland.
>
> Court: Where is that contract? How do you identify that contract?

> Ms. Ainslie: ... in my view it is not simply the four documents in Spanish.
>
> \* \* \* \* \* \*
>
> Court: With respect to the written contract—would you identify any page, paragraph, clause, sentence on the written contract as to which the defendant had a duty with respect to which the petitioner contends defendant failed to fulfill that duty?
>
> Ms. Ainslie: There is none, Your Honor.
>
> \* \* \* \* \* \*
>
> Court: ... So with respect to the written contract—
>
> Ms. Ainslie: Yes, sir.
>
> Court: —the petitioner concedes—
>
> Ms. Ainslie: Yes, sir.
>
> Court: —that the defendant fulfilled all of the obligations therein.
>
> Ms. Ainslie: Yes, sir. I believe so. At least I have no evidence to the contrary....
>
> Court: So I take that as an affirmative.
>
> Ms. Ainslie: Yes, sir.

Tr. 34–36.

Finally, following further dialogue, counsel unequivocally admitted that—in 1988 OPIC sold and transferred to Reforestacion the three specifically-identified properties previously mortgaged to it by John Hull, and foreclosed by it, as promised in the contract. Ms. Ainslie conceded that "OPIC could not transfer anything other than what it had. The only thing that it had was the land it had gotten from Hull." Tr. 75–78.

Against the foregoing background, it is clear beyond cavil that defendant did not breach the written contracts. In fact, it is *judicially* admitted in view of plaintiff's counsel's concession that "... I agree that at least on one of the sets of Costa Rican Records the plaintiff is the record holder of those pieces of property." Tr. 78.

### b. *Implied–In–Fact Contract*

■ Having conceded at oral argument that OPIC fully complied with and did not breach any provision in the *written* sales agreement and/or Mortgage regarding subject properties, plaintiff's counsel expli-

cated, in response to the court's inquiry, the true basis for its allegation that there was an additional implied-in-fact or oral contract. It is this other contract, argues plaintiff, which was created through a "course of dealings" between the parties, which defendant subsequently breached. Specifically, plaintiff outlined several ostensible sequential events, occurring from and after the date of the advertisement in March 1988 to the execution of the sales and mortgage agreement in May 1988, which it avers constitutes *the* implied contract. These circumstances include:

(i) *The Wall Street Journal* advertisement in March 1988, estimating the value of "prime" Costa Rican timberland at $3,500,000, and the price at $550,000;

(ii) the fact that Mr. Wang, who plaintiff alleges was an OPIC agent, led the subject expedition, and subsequently provided "official" maps purportedly showing that the subject land was actually owned by other individuals;

(iii) that Mr. Clegg, subsequent to the dissemination of the advertisement, continued to represent the value of the timber at $3,500,000; and

(iv) that the letter of intent, sent by Mr. Dickstein to Mr. Clegg on April 18, 1988, clearly showed that plaintiff's interest was in the timber on the land.

Tr. 53–55.

We disagree with plaintiff's hospitable hypothesis that these "course of dealings" constitute an oral or, at the very least, an implied contract that was breached by defendant in the face of the two executed contract documents which emphatically memorialize the specific and limited understanding of the parties.[18] For plaintiff to prove that an efficacious implied-in-fact contract did exist, it must satisfy the same criteria required for the existence of an expressed written contract. *Hirschmann v. United States*, 11 Cl.Ct. 338, 342 (1986).

That is to say, plaintiff *must* prove that an offer was made by the defendant; that plaintiff accepted that offer; that there was a meeting of the minds; and that there was mutuality of consideration. *See Black's Law Dictionary* 394 (4th ed. 1968). In addition, it is hornbook law that, when the sale of land is involved, plaintiff *must* also satisfy the Statute of Frauds. Against these requirements, one need only examine the first criterion in this case to determine whether an implied-in-fact contract was formed—namely, the existence of an offer. If it is established that there was no offer, then we need not discuss the additional contractual elements since all of the conjunctive elements would not have been established.

 We find that no offer was made by defendant with respect to an implied-in-fact contract. Two well-established principles support this conclusion. First, it is a general rule of contract law that an advertisement, such as the one in *The Wall Street Journal*, is *not* an offer "that upon acceptance by the plaintiff created a binding contract ... [with the government]," but rather is only an invitation to deal. *Mesaros v. United States*, 845 F.2d 1576, 1580 (Fed.Cir.1988). Accordingly, plaintiff clearly cannot sustain a contention that such a circumstance constituted an offer as a *matter of law*. Secondly, it is also well settled that an opinion by a seller concerning the value of property does not constitute a warranty as to the value of property. *Williston on Contracts*, § 970 (1963). In other words, it is clearly the buyer's responsibility to determine the price he wishes to pay for the property. Therefore, if the seller's representation concerning the value of the land cannot constitute a warranty, it necessarily follows that it cannot be the basis for the formation of an indispensable offer to make a contract.[19]

---

**18.** We view this claim by plaintiff to be rather strained given the fact that Mr. Dickstein is admittedly a very experienced real estate developer with a high-tech background for 20 years as an aerospace engineer. Consider the following statement by Mr. Dickstein—"I am a real estate developer who has acquired many tracts and is experienced in the acquisition of said

tracts." Deft's App. at 143. In light of this concession, it is reasonably inferable that Mr. Dickstein, a highly-educated and intelligent person, would include in the written contract all language relative to the sale and purchase of subject property which he intended.

**19.** Moreover, in the case at issue, Dickstein and Wang decided to form a timbering operation

In light of the foregoing, we hold that defendant made no offer which could be deemed to satisfy that indispensable contract element. As a consequence, plaintiff, of course, could not have accepted an offer that did not exist in law, and, therefore, no resulting contract ensued. Against this background, the issue of mutuality of consideration is now moot and, therefore, need not be examined. Even if we were to address this element, we would find that it has not been established.

■ Finally, even had plaintiff successfully met its burden regarding each of the indispensable elements of an implied-in-fact contract, however, there could nevertheless "be no implied contract where [as here] there is an express contract between the parties covering *the same subject*." (emphasis added). *Algonac Manuf. Co. v. United States*, 428 F.2d 1241, 192 Ct.Cl. 649, 673 (1970), *citing* 17 C.J.S. Contracts § 5 (1963). Since an unambiguous written contract between the parties was acknowledged and admitted by plaintiff, and because said contract terms concern the sale of specifically-identified property which is also the identical subject matter outlined in plaintiff's attempt to prove an implied contract, we find that the holding in *Algonac* prevents the plaintiff in this case from establishing an implied contract which defendant could have breached.

Moreover, upon close examination of plaintiff's claim regarding events occurring from the date of the advertisement to just prior to the execution of the sales and mortgage agreement, it is clear that the substance of plaintiff's allegations was not one in contract but rather an act sounding in tort, *i.e.*, misrepresentation, for which this court possesses no jurisdiction. Therefore, we must dismiss plaintiff's complaint, as explained *infra*.

3. Misrepresentation

■ As noted previously, plaintiff asserts that another contract arose out of

together and, subsequently, Wang became a 60% shareholder in Reforestacion. It was originally Wang's estimate that the value of the timber was $3,500,000, and not OPIC's. Therefore, it is quite unusual that plaintiff now argues that

representations defendant made concerning the value and the nature of the timber *prior* to the execution of the written agreement in May 1988. A close scrutiny of plaintiff's claim, however, indicates that its primary argument(s)—that the "course of dealings" constituted an implied contract—are actually elements of a claim for misrepresentation. Moreover, and surprisingly, plaintiff even acknowledges that it believes the government's conduct constitutes a tort. An indication of plaintiff's true contention was evident at oral argument, where the following statements were made by counsel:

Ms. Ainslie: "[Mr. Dickstein] based his decision that this was an investment opportunity on a total *misrepresentation* by the government, knowing that this land by the estimate—by the valuation of the prior owner was worth no more than $544,000."

\* \* \* \* \* \*

Court: "What do you think of defendant's contention that your actions sounded in tort, not in contract?"

Ms. Ainslie: "Your Honor, there was obviously elements of *misrepresentation* in my position."

\* \* \* \* \* \*

Court: "*Was there a tort* here by the government?"

Ms. Ainslie: "*Yes*, Your Honor, I think there was. But I think its primarily a contract."

\* \* \* \* \* \*

Court: "There was a tort. How would you identify that tort?"

Ms. Ainslie: "I think it was *fraud*, Your Honor. I do."

\* \* \* \* \* \*

Court: "Pure unadulterated fraud?"

Ms. Ainslie: "Yes, Sir."

the $3,500,000 value was misrepresented when it was a shareholder of plaintiff who provided the estimate as to which Mr. Dickstein based his forecasted profits.

Court: "And the fraud was committed when?"

\* \* \* \* \* \*

Ms. Ainslie: "Well, between March and May. Included in that I think would be the contract that they claim—that they induced Mr. Dickstein to sign."

\* \* \* \* \* \*

Court: "Where is the tort committed by the Defendant arising out of the contract....?"

Ms. Ainslie: "Well, I think there was *fraud in the inducement* of this contract, Your Honor."

Tr. 79–81 (emphasis added).

The foregoing admitted "fraud in the inducement" presupposes that certain tortious acts were committed by OPIC *prior* to the execution of the written contracts, *supra,* and not *after* the execution and in the performance thereof. Such a circumstance, in our judgment, will not support a contention that the alleged tortious acts arose in connection with *the performance of the written contract.* Plaintiff's counsel's concession of the existence of a tort is also consistent with established case law. In *Somali Dev. Bank v. United States,* 508 F.2d 817, 205 Ct.Cl. 741, 749 (1974), the court stated that "[t]he decision of the Supreme Court in *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), removes any doubt that claims based on negligent misrepresentation, wrongful inducement, or the careless performance of a duty allegedly owed, are claims sounding in tort." In *Neustadt,* the Supreme Court held that the government was not liable to the purchaser of a home who had relied upon an inaccurate appraisal by the Federal Housing Administration (FHA) and was thereby induced to pay a purchase price in excess of the fair market value of the house. *Id.*

There, the Supreme Court stated that:

> To say, as the Fourth Circuit did, that a claim arises out of "negligence," rather than "misrepresentation," when the loss suffered by the injured party is caused

by the breach of a "specific duty" owed by the Government to him, *i.e.,* the duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs, *is only to state the traditional and commonly understood legal definition of the tort of "negligent misrepresentation,"....*

*Neustadt,* 366 U.S. at 706, 81 S.Ct. at 1300 (emphasis added).

Similarly, in *United States v. Chelsea Towers, Inc.,* 295 F.Supp. 1242 (D.N.J. 1967), the United States initiated steps to foreclose on a cooperative apartment building. The borrower attempted to defend this action on grounds that it had been deluded into an unconscionable bargain by the developer, financiers, FHA, and others. The United States District Court, relying upon *Neustadt,* held that if there was negligent misrepresentation by employees of the United States, such conduct would be "tantamount to that giving rise to a common law action of deceit and is largely confined to the invasion of financial or commercial interests, for which no action lies against the Government, such being barred by the Federal Tort Claims Act, 28 U.S.C. § 2860 [2680](h)." [20] *Id.* at 1247. *See also United States v. Longo,* 464 F.2d 913, 915–16 (8th Cir.1972) (stating that an assertion that the FHA made misrepresentations as to the feasibility of a commercial venture undertaken by a husband and wife pursuant to a loan guaranteed by the FHA was a tort claim barred by 28 U.S.C. § 2680(h)).

It is patently clear that Reforestacion's claim fits within the foregoing line of reasoning and is controlled by *Neustadt.* Plaintiff's assertions as to operative events which occurred between the date of *The Wall Street Journal* advertisement and the signing of the sale and mortgage agreements clearly refer to *representations* made by the government as to the value, the nature, and the location of the land. In addition, plaintiff's counsel candidly admitted that certain elements of its

---

**20.** 28 U.S.C. § 2680(h) (1988) provides that the United States has not waived sovereign immunity for any claim arising out of "misrepresentation, deceit, or interference with contract right."

so-called other claim could be found to be based on misrepresentation or fraud. In light of the foregoing, and the narrow jurisdictional prerequisites of this court, we are constrained to dismiss plaintiff's complaint for lack of subject matter jurisdiction as one sounding in tort.

 Finally, plaintiff also argues that there existed a tortious breach of the contract. It is established law that if the plaintiff can prove that a tort arose out of the contract, then the Claims Court would possess the requisite jurisdiction to entertain such claim. *Fountain v. United States*, 427 F.2d 759, 761, 192 Ct.Cl. 495, 498 (1970), *cert. denied*, 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971). It must be noted, however, that in "determining what constitutes a 'tortious breach,' the court must ... distinguish between tort claims connected to a contract and tort claims independent of a contract." *Summit Contractors, Inc. v. United States*, 22 Cl.Ct. 54, 56 (1990), *citing Transcountry Packing Co. v. United States*, 568 F.2d 1333, 215 Ct.Cl. 390 (1978). Moreover, it "is not jurisdictionally sufficient if the alleged tortious conduct is merely 'related' in some general sense to the contractual relationship between the parties." *H.H.O., Inc. v. United States*, 7 Cl.Ct. 703, 706 (1985), *quoting L'Enfant Plaza Properties, Inc. v. United States*, 645 F.2d 886, 892, 227 Ct.Cl. 1, 11 (1981).

Clearly plaintiff cannot meet this formidable burden of establishing that the tort of misrepresentation was connected to the performance of *the written contract*. *L'Enfant Plaza*, 645 F.2d 886, 227 Ct.Cl. at 11. First, as noted previously, plaintiff has not averred a breach of the written contract. Secondly, plaintiff has failed to prove the existence of 'another contract' emanating out of the alleged "course of dealings" from which a tortious breach could have arisen. Thirdly, plaintiff specifically averred that there was "fraud in the inducement" of the express contract, which is clearly a vexatious act preceding and independent of the written contract. Since the burden requires a specific showing that the tortious act must be connected to the

contract and not independent of the contract, plaintiff cannot establish that a tortious breach occurred. Accordingly, plaintiff cannot prevail on this issue.

### 4. Counterclaim

 Defendant has moved for judgment against plaintiff on a counterclaim for the interest due on plaintiff's unpaid loan. However, even though there appears to be no valid defense to this counterclaim, we have held that the substance of plaintiff's claim is actually a claim in tort to which this court lacks jurisdiction. Because we lack subject matter jurisdiction, "defendant's counterclaim must fall with plaintiff's petition." *Somali Dev. Bank*, 508 F.2d 817, 205 Ct.Cl. at 752, citing to *Mulholland v. United States*, 361 F.2d 237, 175 Ct.Cl. 832 (1966).

### 5. Summary Judgment

Plaintiff and defendant also filed cross-motions for summary judgment. Because we have dismissed plaintiff's claim for jurisdictional reasons, the issues raised on the substantive merits are now moot.

*Conclusion*

The substance of plaintiff's claim is essentially one for misrepresentation, a tort, against the government. Because of the strict jurisdictional requirements of this court, which precludes claims sounding in tort, we are constrained to dismiss plaintiff's complaint. The Clerk shall enter judgment accordingly. Costs shall be assessed against the plaintiff in favor of the defendant.

IT IS SO ORDERED.